## UNITED STATES *v.* CRAIG.

*(Circuit Court, E. D. Michigan.* October 11, 1886.'

1. IMMIGRATION — ACT OF CONGRESS OF FEBRUARY 26, 1885 — REGULATION OF COMMERCE.
   The "assisted immigration" act of February 26, 1885, is a constitutional exercise of the power of congress to regulate commerce with foreign nations.
2. SAME—VIOLATING ACT—OFFENSE, WHEN COMPLETE.
   The offense of assisting the immigration of an alien laborer under contract to work here is not complete until such alien has entered the territory of the United States; and a civil action for the penalty prescribed by section 3 will lie in the district into which he enters, or in any other district in which the defendant may be found.
3. SAME—OFFENSE COMMITTED ON FOREIGN SOIL.
   *It seems* that congress has power to punish by indictment offenses committed by citizens of the United States upon foreign soil

On Demurrer to Declaration.

This was an action of debt to recover a penalty of $1,000 for the importation of a foreign laborer, in violation of the act of congress of February 26, 1885, prohibiting the importation and migration of foreigners and aliens under contract or agreement to perform labor in the United States. The declaration averred, in substance, that on the first day of March 1886, at Point Levi, in the province of Quebec, the defendant, being a citizen of the United States, entered into an express parol contract with one Joseph Morin, an alien, by which

the defendant agreed that in consideration that Morin would immigrate into the United States, viz., into this district, and perform service for him here for six months at two dollars per day as a ship carpenter, he would prepay the transportation of said Morin from Point Levi to Trenton, in this district, and would also pay him as above stated for his services; that afterwards the said defendant did pay the transportation of said Morin, and the latter, in pursuance of said contract, did migrate into the United States, against the form of the statute above set forth. The defendant interposed a general demurrer.

*C. P. Black,* U. S. Atty., *John Atkinson,* and *Don M. Dickinson,* for the United States.

*L. T. Griffin,* for defendant.

BROWN, J. This demurrer raises the single question of the constitutionality of what is known as the "Assisted Immigration Act," of February 26, 1885, the third section of which enacts "that, for every violation of any of the provisions of section one of this act, the person, partnership, company, or corporation violating the same, by knowingly assisting, encouraging, or soliciting the migration or importation of any alien or aliens, foreigner or foreigners, into the United States," etc., "to perform labor or service of any kind, under contract or agreement, express or implied, parol or special, with such alien or aliens, foreigner or foreigners, previous to becoming residents or citizens of the United States, shall forfeit and pay for every such offense the sum of one thousand dollars." The contention of the government is that the act is a valid exercise of the power of congress "to regulate commerce with foreign nations."

The extent of this power, and the definition of the word "commerce," were at an early day made the subject of an elaborate discussion in the famous case of *Gibbons* v. *Ogden,* 9 Wheat. 1. It was claimed by the strict constructionists of that period that the power of congress was limited to the regulation of traffic in goods, to buying and selling, or the interchange of commodities; but it was held by the court to comprehend the whole subject of navigation and intercourse with foreign nations and between the states, and to be subject to no limitation other than those prescribed in the constitution itself.

The same questions were again discussed in the *Passenger Cases,* 7 How. 283, in which was involved the constitutionality of certain state laws requiring the masters of vessels engaged in foreign commerce to pay a tax upon every passenger brought into the state. The case raised two questions: (1) Whether the power of congress to regulate commerce was exclusive; and (2) whether the state statutes in question were regulations of commerce. Both these questions were answered in the affirmative. The first was considered to have already been settled by prior decisions. With regard to the mean-

ing of the word "commerce," the definition of the lexicographers, "an exchange of commodities," was rejected. It was again held to include all navigation and intercourse,—to the transportation of passengers as well as property,—and, as a legitimate deduction from this, that the state laws in question imposing a tax upon this intercourse were unconstitutional.

These views have been reiterated in subsequent decisions. Indeed, it is now settled that the power of congress under this clause extends, not merely to the regulation of navigation and intercourse, and to the coasting trade and fisheries, within as well as without the state, whenever connected with foreign or interstate commerce, but to the control and government of seamen of American vessels, to the nationalization of all ships, built and owned in the United States, by registries and enrollments, to the recording of the muniments of title of all American vessels, to the laws of quarantine and pilotage and wrecks of the sea. . It extends to the laying of embargoes, as well as to the admission of goods free from duty; to the erection of light-houses, the location of beacons, the removal of all obstructions to navigation upon the navigable waters of the United States; to the designation of ports of entry and delivery; to the offer of bounties by discriminating duties, and by special preferences and privileges; and to the erection and control of telegraphic lines. It may encourage or it may entirely prohibit such commerce, and it may regulate in any way it may see fit between these two extremes. 2 Story, Const. §§ 1075, 1076.

Assuming, then, that the power of regulating commerce extends to every species of intercourse with foreign nations, it is difficult to conceive why congress may not inhibit the immigration of any class of persons which may seem to it an undesirable addition to the population of the country. Repeated instances of this kind of legislation are to be found in the statutes, and, so far as we know, none of them have been challenged as beyond the constitutional power of congress. By title 29, as amended in 1875, citizens of the United States are prohibited from embarking or engaging in what is known as the "Coolie Trade" between the United States and foreign nations, or between foreign nations. By the act of March, 1875, the importation of women for immoral purposes, and of convicts, is prohibited, and by the subsequent act of August 3, 1882, this inhibition is extended to idiots, lunatics, and paupers. By the act of May 6, 1882, the importation of Chinese was suspended for 10 years. Punishments are provided for the violation of these acts by fines and penalties upon the persons engaged in the illegal trade, by the forfeiture of their vessels, and by the return of the immigrants to their native countries. In the *Head-money Case*, 112 U. S. 580, S. C. 5 Sup. Ct. Rep. 247, many of the prior decisions are reviewed, and the power of congress held to extend to the imposition of a duty of 50 cents upon each immigrant.

It is claimed, however, that this act is not a valid exercise of the power of regulating commerce, inasmuch as it forbids the encouragement and solicitation of an act which still continues to be perfectly lawful in itself, viz., the immigration of alien laborers. We think this criticism is unfounded. The motives and history of the act are matters of common knowledge. It had become the practice for large capitalists in this country to contract with their agents abroad for the shipment of great numbers of an ignorant and servile class of foreign laborers, under contracts, by which the employer agreed, upon the one hand, to prepay their passage, while, upon the other hand, the laborers agreed to work after their arrival for a certain time at a low rate of wages. The effect of this was to break down the labor market, and to reduce other laborers engaged in like occupations to the level of the assisted immigrant. The evil finally became so flagrant that an appeal was made to congress for relief by the passage of the act in question, the design of which was to raise the standard of foreign immigrants, and to discountenance the migration of those who had not sufficient means in their own hands, or those of their friends, to pay their passage. While the act is undoubtedly, to a certain extent, a reversal of the traditional policy of the government, it does not purport to inhibit or discourage the immigration of foreign laborers in general, but only the importation of such laborers under contracts made previous to their migration or importation. It seeks to effect this by declaring (1) that the prepayment of transportation, or the assistance or encouragement of the migration, of aliens or foreigners under contracts to labor in the United States, shall be unlawful; (2) that such contracts made previous to their migration shall be void; (3) that every person or corporation guilty of unlawfully assisting or encouraging the immigration of such laborers shall be subject to a penalty; (4) that the master of any vessel knowingly bringing such laborers into the country shall be deemed guilty of a misdemeanor.

It was undoubtedly competent for congress to have gone still further, and provided for the return of such laborers to their own country, as was done in the other acts inhibiting the entry of lunatics, paupers, and Chinese; but the act is not to be deemed unconstitutional because the legislature has not seen fit to use all the weapons it held in its hands, or apply unnecessarily harsh remedies. Indeed, except in this particular, the act does not differ materially from the other acts upon the same general subject, and is strictly in line with them. In each of them the immigration is directly or indirectly declared to be unlawful, though in none of them is any attempt made to punish the immigrant. While this does not declare in express terms that the immigration of foreigners under contracts to labor here shall be deemed unlawful, the whole tenor of the statute indicates this to be its purpose, though the penalty is visited only upon the party who aids and assists the immigrant. But, conceding that the contract

only is illegal and void, and the immigration lawful, we know of no principle which forbids congress from declaring that a certain method of procuring the immigration of foreigners shall be unlawful, and imposing a punishment upon those who adopt that method. While the case is one of considerable public interest, the constitutionality of the act is too clear to require an elaborate consideration.

2. The objection that congress has no power to punish the doing of an act in a foreign country is one which goes rather to the jurisdiction of the court to take cognizance of this offense than to the constitutionality of the act; but, as it is one which was argued by counsel, and which must arise in the progress of the case, it may be well to consider it here. By Rev. St. § 732, "all pecuniary penalties and forfeitures may be sued for and recovered either in the district where they accrue, or in the district where the offender is found." Hence, if the illegal contract were the sole cause of action in this case, and were made in a foreign country, as is alleged here, and the right of action accrued the moment the contract was entered into, no action would lie, under the first clause of this section, in this or any other district. But a careful perusal of the section will demonstrate that the penalty is attached, not to the making of the illegal contract, but to assisting, encouraging, or soliciting the migration of the alien to perform labor or service here, knowing that such illegal contract or agreement had been made. To give a right of action under this section three things are essential: (1) The immigrant must first, previous to his becoming a resident of the United States, have entered into a contract to perform labor or service here. (2) He must have actually migrated or entered into the United States in pursuance of such contract. (3) The defendant must have prepaid his transportation, or otherwise assisted, encouraged, or solicited his migration, knowing that he had entered into this illegal contract. So far from the contract being the sole cause of action, apparently it is not necessary that the defendant should have been a party to the contract at all. But, however that may be, we think that if, after having entered into the contract, the alien laborer should refuse to carry it out by migrating, the offense would not be complete, and the action could not be sustained. Admitting that the words "encouraging or soliciting" would seem to indicate an offense in itself, the word "assisting" in the same connection implies that the immigration shall actually take place before the offender can be held liable, for a person cannot assist in doing that which is never done. In such case the person advising or assisting the immigration could no more be convicted than an accessory before the fact could be, if the crime advised were never committed.

Thus, in *Respublica* v. *Roberts*, 1 Dall. 39, the defendant was indicted under a statute declaring that any persons who shall "knowingly and willingly aid or assist any enemies at open war with this state," etc., "by *persuading* others to enlist for that purpose, shall be

adjudged guilty of high treason." The court held that the word "persuading" meant to succeed, and that there must be an actual enlistment of the person persuaded in order to bring the defendant within the intention of the clause.

There is another class of cases in which the soliciting of a person to commit a crime has been held to be the gist of the offense, and a conviction sustained though the crime were never committed; but these appear to be limited to cases in which the act solicited is itself a crime. 1 Bish. Crim. Law, 525. But, however this may be, we think the language of the act, taken together, indicates that the actual migration of the laborer is a necessary element of the offense.

Now, the act of entering the territory of the United States or of migrating, in the language of the statute, must be done within some district of the United States; and the question arises whether, assuming that the contract was made and the transportation prepaid, or other assistance given in a foreign country, the completion of the offense within the United States is not sufficient to give our courts jurisdiction. The answer to this question must be in the affirmative. If a statute create an offense to the commission of which two acts are essential, one of which it is contemplated will be done outside and the other within the state, an indictment will lie in that jurisdiction within the state in which the domestic part of the transaction is performed; for otherwise the statute is rendered wholly inoperative. 1 Bish. Crim. Law, 556, 559. Thus, in actions for usury, there must be proven a usurious contract and a usurious taking; and it was held in *Scott* v. *Brest*, 2 Term R. 238, that the usurious taking was the essential ground of the action. In delivering the opinion of the court of king's bench, the learned judge observed that, "supposing the foundation of this action to have arisen in two counties, where there are two facts which are necessary to constitute one offense, the plaintiff may lay the venue in either." There is a recognition of this principle in Rev. St. § 731, in which it is provided that "when any offense against the United States is begun in one judicial district, and completed in another, it shall be deemed to have been committed in either, and may be dealt with, inquired of, determined, and punished in either district."

Nor is it necessary that the defendant should have been personally present at the time the foreigner entered the United States, to make such entry an element of his offense, so long as he instigated or assisted the act. The locality of a crime is not necessarily in the same jurisdiction with the personal presence of him who commits it. 1 Bish. Crim. Law, § 556.

3. But, again, supposing the offense were wholly upon foreign soil, this action would still lie, under the second clause of section 732, if the defendant be "found" within the district. This is a civil action for a debt, and it is immaterial where the cause of action arose, unless it is made material by statute. In this case the section above

cited merely affirms the common-law rule applicable to all actions *ex contractu*,—that they may be brought wherever the defendant is found,—and repeals *pro tanto* the statutes of Elizabeth and James I, which confined the jurisdiction in actions for penalties solely in the county wherein the cause of action arose. 1 Chit. Pl. 284.

4. Nor do we mean to say that congress has not the power to punish offenses committed by American citizens abroad, by indictment or information. This is a power which has been repeatedly asserted both in England and in this country. Thus, in *Rex* v. *Sawyer*, 2 Car. & K. 101, it was held that an indictment at common law would lie against a British subject for the murder of another British subject in a foreign state, a statute of England having merely created a tribunal with power adequate to try the case. Under an English statute, jurisdiction is given to her criminal courts of all murders committed abroad by English subjects, and convictions have been repeatedly sustained. See *Rex* v. *Depardo*, 1 Taunt. 26; *Rex* v. *Helsham*, 4 Car. & P. 394; *Rex* v. *Mattos*, 7 Car. & P. 458; *Regina* v. *Azzopardi*, 1 Car. & K. 203.

Our own statutes upon the subject of foreign relations vest in the ministers and consuls of the United States residing in semi-civilized countries a complete civil and criminal jurisdiction, extending even to capital offenses. Rev. St. §§ 4083–4130; 1 Bish. Crim. Law, 581, 583. Especially may the power to punish American citizens for acts done abroad be exercised where the penal act or offense is intended to take effect and operate within the limits of the United States, and would be cognizable by the federal courts if committed here. Thus, in Rev. St. § 5331, treason is defined, and extended to all hostile acts committed within the United States *or elsewhere;* and by section 5335 every citizen of the United States, whether resident within the same, or *in any foreign country*, who shall carry on any criminal correspondence with a foreign government, may be punished by fine and imprisonment. By the act of February 25, 1863, this was extended to correspondence with rebels, and jurisdiction given to the district court of the district wherein the offender should be first arrested. By section 1750 perjury committed abroad before a diplomatic or consular officer of the United States may be punished in any district. This section also extends to the forgery of consular signatures and seals. This subject is discussed at length by Mr. Justice CHRISTIANCY, in *People* v. *Tyler*, 7 Mich. 220, 224; and by Mr. Wharton in his Criminal Law, (volume 1, p. 210.)

We have no doubt that, under the power to regulate commerce, congress might make the very offense charged in this declaration, if committed by an American citizen, punishable by indictment, though it were begun and completed in a foreign country. But, as the question does not properly arise in this case, it is useless to discuss it further than to show that criminal jurisdiction is not always limited

to offenses committed within the territorial boundaries of the sovereignty.

We have no doubt of our jurisdiction of this case, and the demurrer must be overruled.