UNITED STATES v. GAY (two cases).

(Circuit Court of Appeals, Seventh Circuit. June 6, 1899.)

Nos. 512, 513.

IMMIGRATION—CONTRACT LABOR LAWS.

Act Feb. 26, 1885 (23 Stat. c. 164) which makes it unlawful to assist the importation or migration of any alien or foreigner under any contract or agreement "to perform labor or service of any kind," was intended to prohibit the importation of foreigners under contract to perform unskilled manual labor, and, being highly penal in its provisions, is to be confined in its construction and application to the effecting of such purpose. An individual agreement to employ a foreigner, resident in another country, as a draper, window dresser, and dry-goods clerk in a store in the United States, and, as a part of his compensation, to refund to him the cost of his passage to this country, is not within the spirit of the statute, and does not subject the employer to the penalty thereby imposed.[1]

In Error to the Circuit Court of the United States for the District of Indiana.

Jesse J. M. La Follette, for plaintiff in error.

Ferdinand Winter, for defendant in error.

Before WOODS and JENKINS, Circuit Judges, and BUNN, District Judge.

BUNN, District Judge. These two cases are identical in their facts, and were heard and submitted together as one case. The actions are brought to recover the penalty of $1,000 under the act of congress of February 26, 1885 (23 Stat. 332, c. 164). The first section of the act reads as follows:

"That from and after the passage of this act it shall be unlawful for any person, company, partnership, or corporation, in any manner whatsoever, to prepay the transportation, or in any way assist or encourage the importation or migration of any alien or aliens, any foreigner or foreigners, into the United States, its territories, or the District of Columbia, under contract or agreement, parol or special, express or implied, made previous to the importation or migration of such alien or aliens, foreigner or foreigners, to perform labor or service of any kind in the United States, its territories, or the District of Columbia."

The plaintiff, in its amended complaint in No. 512, alleges: That the defendant, on the 20th day of July, 1893, did assist, encourage,

---

[1] As to importation of contract labor, see note to U. S. v. Edgar, 1 C. C. A. 52.

and solicit the importation and migration of a certain alien and foreigner into the United States, to wit, one James H. Ferguson, then a native of Scotland, and a subject of the queen of Great Britain and Ireland, for the purpose of performing manual labor as a draper, window dresser, and dry-goods clerk in the United States, under agreement made by the defendant with him prior to his migration. That to induce said Ferguson to migrate to this country the defendant caused an advertisement to appear in the Glasgow Herald, in substance as follows, to wit: "Drapers wanted for a large house abroad. Apply Mr. Gay, Central Station Hotel, after 7 o'clock Thursday evening." That, in answer to said advertisement, Ferguson appeared at said Central Station Hotel, and met defendant, who represented to him that he, said Gay, represented the Syndicate Trading Company, of the city of New York, and that said company desired drapers to work in the United States, to wit, in the city of New York, and that they would receive wages from $12 to $14 per week for work. That defendant agreed with Ferguson that if he would go to the United States and work for said company as a draper, window dresser, and dry-goods clerk he should receive the sum of $14 per week, and, in addition, his passage money and cost of transportation from Scotland to New York would be refunded to him when he began work. That Ferguson, relying upon said promise, migrated to the United States for the purpose of fulfilling said agreement. There is no allegation that he ever was employed by any one, or did any work in the United States, or that his passage money was ever refunded. A general demurrer to the complaint was sustained by the court below, and the action dismissed, and the case brought to this court by writ of error.

Several questions were discussed on the hearing, but there is only one that we think it necessary to consider. The opinion of the court below, printed in the record, shows that the principal ground on which the action was dismissed was that a draper, window dresser, and dry-goods clerk did not come within the prohibition of the statute. The court says, in its opinion:

"The statute in question is highly penal, and must be so construed as to bring within its condemnation only those who are shown by the direct and positive averments in the declaration to be embraced within the terms of the law. It will not be so construed as to include cases which, although within the letter, are not within the spirit of the law. It must be construed in the light of the evil which it was intended to remedy, which, as is well known, was the importation of manual laborers, under contract previously entered into, at rates of wages with which our own laboring classes could not compete without compelling them to submit to conditions of life to which they were unaccustomed. [Citing authorities.] It is well settled by these and other cases that the statute must be construed as limited to cases where the assisted immigrant was brought into this country under a contract to perform 'manual labor or service.'" U. S. v. Gay, 80 Fed. 254.

We are of the opinion that this ruling is correct, in view of the previous construction placed upon the statute by the supreme court in Church of the Holy Trinity v. U. S., 143 U. S. 457, 12 Sup. Ct. 511, and U. S. v. Laws, 163 U. S. 258, 16 Sup. Ct. 998. Mr. Justice Brown, as district judge in Michigan, had already in U. S. v. Craig, 28 Fed. 795, given the motive and history of this act, and the situation which called for it, as follows:

"The motives and history of the act are matters of common knowledge. It had become the practice for large capitalists of this country to contract with their agents abroad for the shipment of great numbers of an ignorant and servile class of foreign laborers, under contracts by which the employer agreed, upon the one hand, to prepay their passage, while, upon the other hand, the laborers agreed to work after their arrival for a certain time at a low rate of wages. The effect of this was to break down the labor market, and to reduce other laborers engaged in like occupations to the level of the assisted immigrant. The evil finally became so flagrant that an appeal was made to congress for the passage of the act in question, the design of which was to raise the standard of foreign immigrants, and to discountenance the migration of those who had not sufficient means in their own hands, or those of their friends, to pay their passage."

This language is quoted by the supreme court in its opinion by Mr. Justice Brewer with approval in Church of the Holy Trinity v. U. S., supra, and a construction is given to the statute which accords with the evident purpose of the law, and the mischief it was intended to remedy. The history of its passage through congress is given, which shows clearly that congress never intended to include in the act skilled labor of any kind. The conclusion of the court is that the title of the act, the evil which was intended to be remedied, the circumstances surrounding the appeal to congress, the reports of the committee of the house and senate, all concur in affirming that the intent of congress was simply to stay the influx of cheap unskilled labor. The report of the committee having the bill in charge in the house contains this significant language, showing the mischief it was intended to remedy:

"It seeks to restrain and prohibit the immigration or importation of laborers who would never have seen our shores but for the inducements and allurements of men whose only object is to obtain labor at the lowest possible rate, regardless of the social and material well-being of our own citizens, and regardless of the evil consequences which result to American laborers from such immigration. This class of immigrants care nothing about our institutions, and in many instances never even heard of them. They are men whose passage is paid by the importers. They come here under contract to labor for a certain number of years. They are ignorant of our social condition, and, that they may remain so, they are isolated, and prevented from coming into contact with Americans. They are generally from the lowest social stratum, and live upon the coarsest food, and in hovels of a character before unknown to American workmen. They, as a rule, do not become citizens, and are certainly not a desirable acquisition to the body politic. The inevitable tendency of their presence among us is to degrade American labor, and to reduce it to the level of the imported pauper labor."

The report of the senate committee on education and labor is equally significant, as follows:

"The general facts and considerations which induce the committee to recommend the passage of this bill are set forth in the report of the committee of the house. The committee report the bill back without amendment, although there are certain features thereof which might well be changed or modified, in the hope that the bill may not fail of passage during the present session. Especially would the committee have otherwise recommended amendments, substituting for the expression 'labor and service' whenever it occurs in the body of the bill the words 'manual labor' or 'manual service,' as sufficiently broad to accomplish the purposes of the bill, and that such amendments would remove objections which a sharp, and perhaps unfriendly, criticism may urge to the proposed legislation. The committee, however, believing that the bill in its present form will be construed as including only those whose labor or service

is manual in character, and being very desirous that the bill become a law before the adjournment, have reported the bill without change."

· These reports throw strong light upon the intention of congress, and the construction which they expected the courts to place upon the act, notwithstanding the very general terms "labor and service of any kind" employed in the act. To give the act a construction so strict as to include a minister of the gospel or other professional man would exclude every person employed in any calling or service requiring superior skill and intelligence, which would constitute a mischief quite as great as the one intended to be remedied by congress. At the circuit in the same case Judge Wallace had felt compelled to follow the plain letter of the law, and give judgment for the plaintiff, especially in view of the exceptions which congress had made of professional actors, artists, lecturers, singers, and persons employed as personal and domestic servants. The reasoning was this: That if, without this exception, the act would apply to this class of persons, because such persons come here under contracts for labor or service, then clearly it must apply to ministers, lawyers, surgeons, architects, and all others who labor in any professional calling. But for these exceptions, and the plain language of the statute, the circuit court would have reached the same conclusion as to the proper construction of the law as the supreme court did, as it says in the opinion:

"The act is entitled 'An act to prohibit the importation and migration of foreigners and aliens under contract to perform labor in the United States.' It was, no doubt, primarily the object of the act to prohibit the introduction of assisted immigrants, brought here under contracts previously made by corporations and capitalists to prepay their passage, and obtain their services at low wages for limited periods of time. It was a measure introduced and advocated by the trades union and labor associations, designed to shield the interests represented by such organizations from the effects of the competition in the labor market of foreigners brought here under contracts having a tendency to stimulate immigration and reduce the rates of wages. Except from the language of the statute, there is no reason to suppose a contract like the present to be within the evils which the law was designed to suppress; and, indeed, it would not be indulging a violent supposition to assume that no legislative body in this country would have advisedly enacted a law framed so as to cover a case like the present."

The statute was again before the supreme court in U. S. v. Laws, 163 U. S. 258, 16 Sup. Ct. 998, and the same liberal construction followed. In this case it was held that a contract made with an alien to come to this country as a chemist on a sugar plantation in Louisiana is not a contract to perform labor and service within the meaning of the act. It is shown by Mr. Justice Peckham, announcing the opinion in that case, that a similar construction had been adopted by the courts in New York in regard to the statutes for claims of laborers. See Ericsson v. Brown, 38 Barb. 390; Aiken v. Wasson, 24 N. Y. 482; Coffin v. Reynolds, 37 N. Y. 640; Wakefield v. Fargo, 90 N. Y. 213. If construed strictly, the act would include every person employed to perform any sort of labor or service, except those placed among the exempted class by congress. It would include ministers, lawyers, physicians, surgeons, architects, engineers, bookkeepers, stenographers, typewriters, clerks, salesmen, drapers, and window dressers. But when we once break away from the letter of the law,

and seek for its true meaning and intent, which was to stay the influx of cheap, unskilled manual labor, then the liberal construction adopted by the supreme court furnishes the only safe resting place. Under such a construction it seems quite clear that the employment of a single person to come to this country and engage for a dry-goods house as a draper, window dresser, and clerk does not come within the true intent and meaning of the prohibition. There was no such mischief as that ever complained of, and none such to be remedied. It is not that cheap, uncultivated, unintelligent labor from competition with which our institutions stood in danger. The main purpose of the law no doubt was to prevent great corporations and business firms from contracting abroad for common, cheap, unskilled laborers to work in our mines, our mills, and factories, in our lumber woods, in grading canals and railroads, and in work upon other public improvements where a great many manual laborers are required. The practice of employing such laborers and importing them to this country, and paying their passage under contracts to work a stated time at low rates of wages with which our better-fed and better-housed workmen could not compete, was the mischief congress had in mind. A silk draper or linen draper is not a common laborer. He may do work with his hands, as does a minister, a lawyer, or surgeon, but to designate him as a common manual laborer would be a misuse of the English language. The habit of working with the hands is not by any means the criterion. All men work with their hands. But in some occupations, like that of working with a spade or shovel and wheelbarrow, or as a common hand in a sawmill or in the lumber woods with a peavey or crosscut saw, the value of the labor consists principally in the physical results accomplished. The surgeon also works with his hands, but the beneficial results in his case come more from the skilled labor of the mind, guided by large study and experience, in connection with that of the hand. A stenographer or typewriter works constantly with the hands, and yet the value of his work does not consist mainly in the manual labor done, and it would be a misuse of terms to call him a laborer. He is not such in the ordinary acceptation of the term, no more than is a draper or window dresser. The need of window dressers in large commercial centers like New York to dress out window fronts for an artistic display of silks and woolens is very well known. It has become a favorite way of advertising, and the tradesman who can present the most attractive window is apt to get the best trade. The occupation does not necessarily require any manual labor at all, as that may all be done under the direction and superintendence of the one skilled in that trade or business. But it evidently requires experience, with good taste and judgment. If such a person is not an artist, he should at least have intelligence with an artistic taste and judgment. He must know the value of perspective, and must be able to arrange and combine light and shade and colors to the best advantage,—something as an artist does in a painting. To do this with proper effect requires something more than mere muscle and a spinal cord. It calls for intelligent skill. So with a skillful salesman of silks and woolens, a mercer or draper, though he employs the labor of his hands to a certain extent,

the principal value of his services comes from a different and more occult source. He must know his wares thoroughly, and the best manner of exhibiting them, and have some knowledge and experience in the treatment and management of customers. It was not service of this kind that congress sought to shut out, but the cheaper, grosser sort of unskilled and unhoused manual labor which was coming from abroad in competition with the common labor of this country, which has ever been on a somewhat higher plane, and where it was the purpose of congress in the enactment of the law to keep it. Countenance is lent to this construction also by the act of congress amending the law passed February 23, 1887 (24 Stat. 414, c. 220). Section 8 of this act provides that all persons included in the prohibition of the act shall be sent back to the nations to which they belong and from whence they came. It would be absurd to suppose that congress intended that persons employed in trade, or in any business requiring intelligence and skill, or, indeed, any except those from the lowest social stratum engaged in unintelligent and uncultivated labor, should be sent back to the nations from whence they came. It has always been the policy of congress as well as the states to encourage immigration of the better and more intelligent classes. To prohibit the introduction of these was not the purpose of congress in the enactment of the present law. The judgment of the circuit court in each of the two cases is affirmed.