### UNITED STATES v. MORRISON.

(District Court, S. D. Iowa, C. D. May 14, 1901.)

INFORMATION—DEMURRER—GROUNDS.
    The truth of specific averments of fact made in a criminal information cannot be put in issue and determined on demurrer, unless the evidence necessary to such determination appears from the record or is of such character that the court may take judicial notice of it.

On Demurrer to Information.

Lewis Miles, U. S. Atty.

John F. Lacey and William R. Lacey, for defendant.

McPHERSON, District Judge. November 22, 1900, on an ex parte application, the court granted leave to the United States attorney to file an information against the defendant, accusing him of a violation of the laws prohibiting the giving of aid to the bringing of aliens to this country under contract. The information filed is in two counts. The first count in substance charges that defendant, a resident of Grinnell, Iowa, did in June, 1900, aid in bringing from Prague, Austria, one Adolph Zuza, a cutter of ladies' kid gloves, who was then a native, resident, and citizen of Prague, Austria, and then a subject of the emperor of Austria. Zuza was not a singer, lecturer, minister of the gospel, actor, artist, professor of a college, and not a member of defendant's family or his secretary. He was a cutter of ladies' kid gloves, and had no other occupation or profession, and did not, and was not to, sustain any other relation in this country, either to the defendant or any other person, than as such cutter for defendant. The information also charges that, while Zuza was still in Austria, he and defendant entered into an agreement by which Zuza was to perform labor in this country, and under which agreement he came to the United States with money furnished him by defendant for his transportation; that the agreement preceded furnishing the aid, and preceded Zuza's coming to America pursuant to the agreement; that Zuza did come from Austria to the United States under said agreement, and after having received the aid in transportation from defendant, to perform in the United States the services and labor of cutting ladies' kid gloves. And the information then charges:

"And the said Adolph Zuza was not * * * then and there a skilled workman under any contract and agreement to perform labor and services in the United States in or upon any industry not then established in the United States, and not established in the United States February 26, A. D. 1885."

The second count of the information is in the same language as the first, excepting as to the name of the other person of Austria to whom aid was furnished, and who came to the United States. The information was duly verified by the United States attorney. A warrant for defendant's arrest was issued, and he has demurred to the information. There is no claim but that the information is in due form, and that it has all allegations and recitals necessary to constitute a crime, if a person who is a ladies' kid glove cutter is such a person as is prohibited from being brought to this country under agreement and with aid furnished him to enable him to come.

The grounds of the demurrer are that a ladies' kid glove cutter is an expert mechanic; that he is not a person engaged in common or ordinary manual labor; that the business requires skill; that February 26, 1885, the business of making ladies' kid gloves was not an established industry in the United States; that the trade of a ladies' kid glove cutter requires skill and intelligence, and is an art or profession known to but very few persons in the world. On demurrer the court will consider only such matters as are alleged and of which judicial notice is taken. The acts of congress under which the information has been filed are highly penal, and as a criminal

statute are to be strictly construed. In this country no person is ever subjected to fine or imprisonment because of the common law, but only when there is a plain statute clearly condemning the acts complained of as being a crime.

It is conceded by counsel for both the government and the defendant that this government has the power to regulate or prohibit immigration of foreigners. Generally the policy has been to encourage it. This went on for many years, until quite a per cent. of our best citizens were people of foreign birth. But selfish men took advantage of the opportunities offered to laboring men, and it is said that as far back as 1859 alien iron moulders were brought over to take the place of workmen then on strike in Troy, in the state of New York. After the Civil War the Pacific Coast states were over-run by the Chinese, until the traffic in coolies became a scandal, and almost or quite destroyed the opportunities of our own people on the Pacific Coast for getting work at remunerative prices. The evil so grew that it became necessary for congress to enact the most stringent legislation against Chinese immigration; and congress did enact such legislation against the Chinese, partly because that people would not assimilate with our people, partly because they only intended to remain in America a short time, partly because of their immoralities, but largely because from their methods of living they could underbid American workmen. The Pacific Coast condition after a short time became largely the condition of Eastern states, and particularly in those states having coal and large manufacturing interests and lumber interests. The records show that about the year 1883 bills were introduced in large number in both the senate and the house to correct the evil. In December, 1883, for the first time, the house of representatives provided for a committee of labor, to which all bills upon the subject were referred. The question of immigration of laborers became one of great public concern. Political parties took up the question, and it became one of general public discussion. The labor committee of the house and the appropriate committee of the senate took much evidence and made elaborate reports strongly urging legislation.

From these matters, which are now general history, as well as that which is in the recollection of all, it is known several evils existed, which congress undertook to correct; and existing evils are always considered as having great and convincing force in the construction of a statute. The labor organizations of the country appealed to the political parties and to legislatures and to congress for help, by way of correction of the evils. They furnished the proof, if proofs were needed, that when a strike in this country occurred, or one was threatened or impending, or when labor was in great demand, the large concerns, with much capital behind them, sent agents to Europe, and sometimes to Asia, for laborers to take the place of workmen. They were brought over under contract. Many of them lived, while here, but little, if any, better than animals. They lived together in large numbers in small rooms. Many lived together regardless of sex, and often regardless of the marriage relation. They lived on nearly nothing, and that nearly nothing was often

food of the most disgusting kind; and, so living, they only asked and only received wages on which an American could not live. They gave their children no education. They never intended to make this country their home, and yet tens of thousands of them went through the form of being naturalized. They debased and prostituted the right of suffrage. All these things appear in most graphic language in the reports of committees to congress,—one by Senator Blair to the senate, June 28, 1884, and one by Mr. Faron, of Ohio, to the house, February 23, 1884. On these reports the act of February 26, 1885, was enacted by congress, supplemented later by other laws. Under these statutes the defendant is now prosecuted.

But immigration was not prohibited. Immigration under contract was not prohibited. But certain kinds of immigration were prohibited, and immigration of certain kinds under contract was prohibited. And the question is whether the immigration of the two ladies' kid glove cutters who were brought over under contract with defendant are prohibited. Before discussing this question, as the question of the case, I think another matter one of importance. It is a matter of general knowledge that, during all the times the foregoing matters were under discussion before the country and before congress, a question which was ever being asked was, why enact protective tariff laws, to protect American laborers against the paupers of foreign countries, and yet allow the pauper laborers of foreign countries to be brought here to labor? The difference was that, with the foreign pauper here, the little he ate and the little he wore were furnished him by our own producers and manufacturers; but the fact remained that in either case the foreign pauper was in direct competition with the American laborer. But there was this other difference: Generally the pauper laborer who remained was a skilled workman, while the one who came or was brought to this country under contract was unskilled. Generally he was the common, cheap, ignorant, and unskilled workman. But the truth is that the protective tariff laws and the laws against importing an alien laborer are upon the same subject and have the same purpose in view, which is that of protecting the laboring man of our country from the competition of the laboring man of foreign lands. And the subject of "kid gloves," as it is found in the schedules of the last four tariff laws of the United States, will show the ever-increasing concern of congress to not simply raise a revenue, but to bring about the  manufacture of such gloves in this country.

The practical effect of all this, and especially the result of the tariff act of 1897, is of great interest. But, so far as this case is concerned, the difficulty is, not to get information, but to get information of which a court will take judicial notice. I have much information from merchants and those manufacturing other gloves. I have read much from the Glovers' Journal. I have correspondence with men who claim to have, and no doubt do have, knowledge of the subject. But, on demurrer to specific allegations of fact to the contrary in the information, can I, and am I allowed to, use such facts, and on such facts, thus acquired, determine the demurrer? Am I not confined to the record, supplemented only by such facts as courts can

judicially notice? And can a court judicially notice those things not in the laws, nor in the official records, nor facts of history and generally known? I have made the most diligent and tireless search in the reports of the departments for data and facts germane to the imports of ladies' kid gloves and the manufacture thereof in this country, and received practically no information. It is plain to me that the tariff laws, and especially the one now in force, had for one of its objects either the creation of the industry, if not already established, or its maintenance, if already established. And this, perhaps, is the one question 'in this case: Is the manufacture of ladies' kid gloves an established business in the United States? If established, when was it established?

I cannot resort to evidence in passing upon a demurrer, and yet information in the nature of evidence is all I have. I know, and perhaps it is of general knowledge, that there are some ladies' kid gloves manufactured in this country. But it is claimed that such gloves have not been so manufactured until since the passage of the tariff act of 1897, and then not to the extent of making it an established industry. But as yet they are manufactured in limited quantities, and in but three or four places in the United States, and possibly at but the one place west of the Mississippi river, and that at Grinnell, Iowa, by defendant. The exact facts as to these matters I do not know. But, if the foregoing is substantially a correct statement of the facts, then I take it no one would claim that defendant is guilty of the crime charged, because the statute provides:

"Nor shall this act be so construed as to prevent any person or persons, partnership, or corporation from engaging, under contract or agreement, skilled workmen in foreign countries to perform labor in the United States in or upon any new industry not at present established in the United States."

It will be kept in mind that this statute was approved February 26, 1885. It will be kept in mind, also, that the statute recites "not at present established." Do the words "at present established" mean the date the act was approved by the president, or the date of the acts complained of in the accusation against defendant? Counsel have not argued this point, and I am not prepared to decide it. The United States attorney, in preparing the information, charges it both ways. He says that both February 26, 1885, and in 1900, when defendant did the things complained of, the manufacture of ladies' kid gloves was established in the United States. Such is his information, or that of the officer directing him to present the charge. But such is neither my information nor belief. But he makes it an allegation of fact, and most specifically charges it as truth, and they are facts concerning which the court cannot take judicial notice. Evidence to sustain the allegations of the United States attorney must be furnished, and a jury will determine the facts. But, as the case will be tried, it will be as well to present the rulings of the courts and of the departments.

The case of Holy Trinity Church v. U. S., 143 U. S. 457, 12 Sup. Ct. 511, 36 L. Ed. 226, was one arising under the statute invoked in the case at bar. The person brought to this country under contract was a minister of the gospel. The statute as it then stood

did not except a minister. But Justice Brewer, in speaking for the entire court, urges two propositions worthy of being kept in mind, not only because it is the duty of this court to observe the holdings of that court, but because his arguments are so pertinent to the case now under consideration. Among other things he says:

"Another guide to the meaning of a statute is found in the evil which it is designed to remedy: and for this the court properly looks at contemporaneous events,—the situation as it existed, and as it was pressed upon the attention of the legislative body."

He then quotes with approval the opinion of Justice Brown when, as district judge, he decided the case of U. S. v. Craig (C. C.) 28 Fed. 795, who presented the historical facts preceding and attending the passage of this statute, and he sets out much of the house report, which clearly shows the evil struck at and the only evil; and this report, so often referred to, in my judgment contains the key to the meaning of the statute, wherein it recites:

"It [the bill] seeks to restrain and prohibit the immigration or importation of laborers who would have never seen our shores but for the inducements and allurements of men *whose only object is to obtain labor at the lowest possible rate, regardless of the evil consequences,*" etc.

I have underscored certain words. Another thing Justice Brewer presses in his opinion is that statutes should be so construed as not by intendment to hold one guilty of a crime, but give the statute, not a literal, but a sensible, construction, and such a construction as will reach the evils complained of when the statute was enacted.

In case of U. S. v. Laws, 163 U. S. 258, 16 Sup. Ct. 998, 41 L. Ed. 151, the person brought over under contract was a chemist for a sugar plantation. A sugar plantation was certainly an old, established industry, and chemists in this country are numbered by the thousands; and the supreme court held that the statute had not been violated. Justice Peckham, in writing the opinion, among other things, said:

"The fact that the individual in question by his contract had agreed to sell his time, labor, and skill to one employer and in one prescribed branch of science does not in the least militate against his being a professional chemist, nor does it operate as a bar to the claim that while so employed he is nevertheless practicing a recognized profession. It is not necessary that he should offer his services to the public at large, nor that he should hold himself ready to apply his scientific knowledge and skill to the business of all persons who applied for them, before he would be entitled to claim that he belonged to and was actually practicing a recognized profession. As well might it be said that the lawyer who enters into the service of a corporation and limits his practice to cases in which the corporation is interested thereby ceases to belong to the profession. The chemist may confine his services to one employer so long as the services which he performs are of a professional nature. It is not the fact that the chemist keeps his services open for employment by the public generally which is the criterion by which to determine whether or not he still belongs to or is practicing a recognized profession. So long as he is engaged in the practical application of his knowledge of the science, as a vocation, it is not important whether he holds himself out as ready to make that application in behalf of all persons who desire it, or that he contracts to do it for some particular employer and at some named place. We have no doubt that the individual named comes within one of the exceptions named in the statute."

This question was elaborately discussed by the circuit court of appeals for the Sixth circuit in the case of U. S. v. Gay, 37 C. C. A. 46, 95 Fed. 226. In that case the person brought over was "a draper, window dresser, and dry-goods clerk," who was to receive about $2 per day for his work. In that case the holding was that the statute only prohibited the bringing of cheap, common, and unskilled laborers. I do not so believe. Glass blowers, iron moulders, locomotive engineers, telegraphers, and men of many other vocations are neither cheap, common, nor unskilled; but they have been so long recognized as workmen in established industries, and are in America numbered by the hundreds of thousands, that I believe it would be an unlawful act to bring a man of such a vocation to this country under contract. Just what is required of a window dresser I do not know, and I neither approve nor disapprove of what the court actually decided. But I do not agree with much of the argument of the opinion.

The statute in question is enforced under general regulations of the secretary of the treasury. November 26, 1900, the commissioner general of immigration, Hon. T. V. Powderly, filed an opinion touching the right to land in this country of certain lace makers. The fact need only be stated that, as the reports show, Mr. Powderly perhaps had more to do with bringing about this legislation than any other man or number of men. For years he has been aggressive, earnest, and tireless in seeking protection to American laborers; but he held that lace making was a new industry in this country, and yet I suspect that lace has been made by ladies from since the time the needle and thread were first used. But that did not seem to be the test with Mr. Powderly, and without doubt he was right. It is fair to say that the opinion was in part because of the fact that thread was imported with which to make the lace, and the persons were also thread makers. But his opinion was not alone grounded upon that fact. This opinion was approved by Secretary Gage.

Such, briefly stated, have been the holdings of the courts and of the department having the matter in charge. But the United States attorney charges in the information, and charges it most specifially, that February 26, 1885, as well as in the year 1890, the manufacture of ladies' kid gloves was an established industry in the United States. This allegation calls for proof, and the government must furnish it. And it follows that the demurrer must be overruled because of the allegations in the information. I have a belief touching them; but it may be that the government will furnish evidence, of which I know nothing. At all events, I cannot judicially notice the facts, and the material facts are practically all in dispute. What are the duties of a ladies' kid glove cutter? Is it skilled labor? Can it readily be procured in this country? Is it an occupation or profession? Is it an established business in this country? If so, when was it established? Some of these questions, possibly all, are involved. So I will submit the case to a jury to find the facts. We will then know the services of a ladies' kid glove cutter. We will then know whether he is a common, unskilled, and cheap laborer.

We will then know whether he must sort and prepare the skins from which the gloves are made. We will learn whether ladies' kid glove cutters can be obtained in this country. We will learn whether any one working at glove making can cut ladies' kid gloves, and whether it is done only from a pattern furnished. We will learn how extensively ladies' kid gloves were manufactured in the United States February 26, 1885, and how extensively they were manufactured in 1900. We will learn when, if at all, the manufacture of ladies' kid gloves became an established industry in this country. All this is for the government to show. We will ascertain whether it is true that there are but few such cutters in the United States, and possibly but the one, or but few at most, of such manufactories west of the Mississippi river, and but few in the country. And it is claimed by defendant's counsel that for every cutter a number of persons residents in this country are employed to make the gloves, and if the cutters are deported such makers are thrown out of employment. We will learn as to the truth of this, and the statute will be construed so as to give aid to American laborers, and not such construction as to throw them out of employment. The government having alleged to the contrary, as against all of defendant's claims, and they being matters of which the court cannot take judicial notice, issues of fact are raised, and the government will be required to furnish the evidence to sustain its allegations; and on the evidence for and against the law can be applied without difficulty.