UNITED STATES v. PARSONS.

(Circuit Court of Appeals, Sixth Circuit. June 7, 1904.)

No. 1,296.

1. ALIENS—ASSISTING IMMIGRATION UNDER CONTRACT—FARM LABORER.
    The bringing of an alien into the United States under contract to work on a farm as a laborer, under the direction of others, is within the prohibition of Act Feb. 26, 1885, c. 164, 23 Stat. 332 [U. S. Comp. St. 1901, p. 1290], as amended, which makes it unlawful to assist in the immigration of any alien under a contract "to perform service or labor of any kind," with certain exceptions; such employment not being within any of the excepted classes.

In Error to the Circuit Court of the United States for the Eastern District of Michigan.

Wm. D. Gordon, U. S. Atty., and James V. D. Willcox, Asst. U. S. Atty.

H. E. Spalding and Walker & Spalding, for defendant in error.

Before LURTON, SEVERENS, and RICHARDS, Circuit Judges.

RICHARDS, Circuit Judge. This is a suit to recover a penalty of $1,000 under the act of February 26, 1885, c. 164, 23 Stat. 332 [U. S. Comp. St. 1901, p. 1290], as amended, prohibiting the importation of aliens under contract to perform labor in the United States. To the declaration there was a plea of the general issue. The only witness examined on behalf of the government was the alien immigrant, Trembly. At the conclusion of his testimony, the court, on motion, directed a verdict for the defendant on the ground that the farm work which Trembly was hired to do does not come within the statute.

The defendant, Parsons, was a citizen of Michigan, having a farm in Oakland county; Trembly a subject of Great Britain, residing in the province of Ontario, Canada. The declaration alleges that about May 1, 1900, the defendant entered into a contract with Trembly, under which the latter agreed to migrate from Canada into the United States, and there perform service for the defendant "in and upon the farm of said defendant, in said county of Oakland." For this the defendant was to pay Trembly $20 per month for eight months, and $15 per month for the next succeeding four

months, and also furnish board for Trembly and his family, and a house for them to live in. It was averred that the labor and service contracted for was not work in any "new industry," but in one long established, which might be done by any citizen of the United States "skilled in the business of farming." There is the further averment that the defendant furnished Trembly $40 to pay his transportation from Canada to Michigan, and that Trembly did migrate to Michigan in pursuance of the contract. Trembly testified that he was living in St. Thomas, Canada, in the spring of 1900. His cousin, Libbie Trembly, who was housekeeper for the defendant, was visiting in Canada, and talked to him about moving to Michigan to work on the defendant's farm. As a result, negotiations both by letter and telephone between the defendant and Trembly ensued, ending in the agreement set out in the declaration. Trembly's testimony and the defendant's letters leave the precise work to be done by Trembly undefined. It is clear it was to be labor and service on the defendant's farm; but just what labor or service, does not appear. Trembly testified that, at the time he entered into the agreement with the defendant, he was working at coopering at Ingersoll, making from $2 to $2.25 a day. Before that he had been farming—not all his life, but the biggest part of it. "I consider myself," said he, "a competent farmer. I am familiar with stock, and know how to take care of it. I don't know as I am much of a hand for dairy work. I have done considerable farming, though, but don't consider myself a skilled farmer, by any means. You may call me what you like. I can go on a farm and do the work the way it ought to be done."

In his first letter, dated April 6, 1900, the defendant said:

"Libbie has told me of her conversation with you about coming out here to be with us, and I am glad you think favorably of it for I am very much in favor of and with the Canadians as I have always found them good substantial men and capable. Now in reference to the wages. I have given my men during the winter with their wives from $12.00 to $15.00 a month and in the summer $20.00 without children. You will have three more in your family to board than I had expected, however, on thinking it over I will give you $200.00 cash from now until April 1, 1901, and board and rooms for yourself and family complete so that you will have no expense only your clothes. Now Libbie tells me you would like thirty dollars in advance so I sent it in this letter," etc.

In the defendant's letter of April 10, 1900, the offer of compensation was increased to the figures stated in the declaration—$220 for 12 months—and the amount to be advanced to $40. In this letter the defendant said:

"Come when you get your things in shape. I have a man until you come and he will help me until you come."

Sections 1 and 5 of the act of February 26, 1885, as amended, read as follows:

"Be it enacted," etc., "that from and after the passage of this act it shall be unlawful for any person, company, partnership, or corporation, in any manner whatsoever, to prepay the transportation, or in any way assist or encourage the importation or migration of any alien or aliens, any foreigner or foreigners, into the United States, its territories, or the District of Columbia, under contract or agreement, parol or special, express or implied, made

previous to the importation or migration of such alien or aliens, foreigner or foreigners, to perform labor or service of any kind in the United States, its territories, or the District of Columbia."

"Sec. 5. That nothing in this act shall be so construed as to prevent any citizen or subject of any foreign country temporarily residing in the United States, either in private or official capacity, from engaging, under contract or otherwise, persons not residents or citizens of the United States to act as private secretaries, servants, or domestics for such foreigner temporarily residing in the United States as aforesaid; nor shall this act be so construed as to prevent any person, or persons, partnership, or corporation from engaging, under contract or agreement, skilled workmen in foreign countries to perform labor in the United States in or upon any new industry not at present established in the United States: provided, that skilled labor for that purpose can not otherwise be obtained; nor shall the provisions of this act apply to professional actors, artists, lecturers, or singers, nor to persons employed strictly as personal or domestic servants; nor to ministers of any religious denomination nor persons belonging to any recognized profession, nor professors for colleges and seminaries: provided, that nothing in this act shall be construed as prohibiting any individual from assisting any member of his family to migrate from any foreign country to the United States, for the purpose of settlement here."

23 Stat. 332, 333 [U. S. Comp. St. 1901, pp. 1290, 1292].

The court below took the view that, as construed by the courts, this act was intended to, and does, exclude only "the ignorant, servile, and pauper class of foreign laborers brought here under contract by which their passage money was prepaid." It was intended to shut out only "an undesirable class of people—those who obtain their living by unskilled labor, and who are of such a condition in life and with such scanty means that they could not obtain passage to this country, and are likely to become a public charge." With respect to the labor and service to be performed under the contract in question, the court said:

"I cannot bring myself to believe that the avocation of farmer, for which the defendant [alien] was employed, is within the statute. Certainly that is an employment that requires a high degree of intelligence and experience that is able to meet the different conditions under which the work of agriculture must be performed—the different crops, the different methods of tillage, and a great many other contingencies which every farmer must necessarily meet. It is a high order of industry, and is as well entitled to be called a skilled avocation as is that of a chemist. It is a vocation which has been recognized as entitled to the highest respect. For that employment this man was hired, and, while he stated that he did not call himself a skilled farmer, there are many who would make the same admission who have conducted farms for years. That is only a question of degree."

While we agree with the court below that the vocation of a farmer is one which has been recognized as entitled to the highest respect, we are unable to concur in the conclusion that the only reasonable inference to be drawn from the testimony is that Trembly was employed by the defendant to perform service "as a farmer" in the management of his farm, directing its operation, and necessarily determining those questions which require special skill, experience, and intelligence "as a farmer." Trembly had worked on a farm nearly all his life. He did not claim to be a skilled farmer, but he knew how to do farm work. He was to be paid a comparatively small amount, with board, based on what the defendant was paying his farm hands. There was no testimony as to whether the

wages to be paid Trembly were those of a farmer or of a farm laborer. Doubtless there were members of the jury whose experience, in the absence of testimony, would have thrown light on this question. If, as the court below thought, the effect of certain decisions is to limit the statute to the exclusion of only unskilled manual labor (a result we do not concede), it does not follow, in our opinion, that the fact the imported labor is to be used on a farm takes it outside the statute. The labor of a farm hand is manual, and may be as ignorant and unskilled as that of a workman on a railroad or in a mine or forest. It depends upon the kind of labor to be done. The most ignorant and servile labor ever imported into this country was for the plantations. A man imported to handle a hoe and plow is not necessarily more intelligent or desirable than one brought to handle a pick and drill, or a shovel and scraper, or a "peavy and a crosscut saw." · U. S. v. Gay, 95 Fed. 226, 230, 37 C. C. A. 46, 50. It is as reasonable to credit a section hand with the skill and intelligence of the superintendent of construction, as a farm hand with that of a trained agriculturalist.

The statute under consideration was adopted for a wise purpose, and ought not to be whittled away by a process of judicial construction. It contains specified exceptions, and they ought not to be extended without good reason. In U. S. v. Laws, 163 U. S. 258, 266, 16 Sup. Ct. 998, 1001, 41 L. Ed. 151, it was held that a chemist imported to work on a sugar plantation might be regarded as belonging to "a recognized profession," within the exception of the statute. If this class is to be construed so as to cover farmers, obviously only those trained in agriculture as a science, and employed to manage a farm, should be included. Special mental as well as manual training is required to make one a member of a recognized profession.

Trembly had worked on a farm and as a cooper. Where similar employments have been before the courts, they have been held to be within the prohibition of the statute. Thus in U. S. v. Craig (C. C.) 28 Fed. 795, decided by Judge, now Mr. Justice, Brown, the imported alien held within the statute was employed to do service "at $2 per day as a ship carpenter." In point of skill and intelligence, a ship carpenter will not suffer in comparison with a cooper. Again, in the case of In re Cummings (C. C.) 32 Fed. 75, the excluded alien was employed to do service on a farm in Kentucky "as a farm servant or dairyman." This was work on a farm, but the court held it did not come within any of the exceptions. "Manifestly," said Judge Lacombe, "it was the intention of Congress to exclude immigrants to this country under contract to perform such labor."

If the standard of labor on a farm is high, the way to keep it so is to enforce the statute, and keep out those who have to be paid in advance to come here. The desirable immigrant is the one whose own ambition prompts him to come, and who is sufficiently industrious and economical to save money of his own to bring him here.

We think the court, under proper instructions, should have left it to the jury to determine whether Trembly was employed to manage the farm as a farmer, or simply to work on the farm as a laborer under the supervision of the defendant. If he was employed and imported for the latter purpose, he came within the statute.

The judgment of the lower court is reversed, and the case remanded for further proceedings not inconsistent with this opinion.