## MOFFITT v. UNITED STATES.

### (Circuit Court of Appeals, Ninth Circuit. February 1, 1904.)

### No. 951.

**1. ALIENS—CONSTRUCTION OF IMMIGRATION LAWS—OFFENSES.**

The immigration laws of the United States, in so far as relates to punishment for their violation, are highly penal, and are to be strictly construed, and their provisions applied only to cases clearly within their terms and their spirit, construed as a whole.

**2. SAME—NEGLECT OF MASTER TO DETAIN ALIEN ON BOARD HIS VESSEL—IMMIGRANTS DEFINED.**

Act March 3, 1891, c. 551, 26 Stat. 1084 [U. S. Comp. St. 1901, p. 1294], entitled "An act in amendment to the various acts relative to immigration and the importation of aliens under contract or agreement to perform labor," clearly relates to immigration, and applies only to the entry into the United States of immigrants who, according to standard definitions of the term, are persons removing into the country for the purpose of permanent residence, and the penalty imposed by section 10 (26 Stat. 1086 [U. S. Comp. St. 1901, p. 1299]) on the master of a vessel for neglecting to detain on his vessel any "alien who may unlawfully come to the United States" on such vessel, or to return him to the port from which he came, must be construed in the light of such general purpose, and limited in its application to cases of alien immigrants.

3. SAME—EVIDENCE CONSIDERED.

Defendant was indicted under Act March 3, 1891, c. 551, § 10, 26 Stat. 1086 [U. S. Comp. St. 1901, p. 1299], for neglecting to detain on the steamship of which he was master an alien not entitled to land in the United States, by reason of which neglect the alien escaped and landed in the United States. On the trial the following facts were shown by an agreed statement: When defendant's ship was anchored off shore at a Mexican port a number of native peddlers came on board to sell their wares. When one of them came on deck to go ashore he found that the vessel had started and proceeded some distance. Defendant refused his request that he be taken back and landed, but promised to stop and leave him on the return trip, and thereupon put him at work, but without placing him on the crew list. On arriving at San Francisco an immigration officer notified defendant not to land the Mexican without permission, but the latter stated he did not wish to land, but wanted to be taken back home, and he was not confined. Just before the vessel sailed, however, he left it without the consent or knowledge of defendant or any of his officers, and had not returned when she left the port. *Held*, that such facts were not sufficient to warrant defendant's conviction, the alien not being an immigrant within the meaning and intent of the act, whom defendant was required to put in irons or keep under guard to secure his return on the vessel, and there being no evidence or claim that he did not act in good faith.

In Error to the District Court of the United States for the Northern District of California.

The plaintiff in error, master of the British steamship Tucapel, was indicted in the District Court for the Northern District of California for an alleged violation of the provisions of section 10, c. 551, Act March 3, 1891, 26 Stat. 1086 [U. S. Comp. St. 1901, p. 1299]. The indictment contained three counts. A demurrer was interposed to this indictment upon the ground that it did not in either count set forth sufficient facts to constitute an offense against the United States. A motion was also made to quash the indictment upon the same ground. This motion was denied. The demurrer was sustained as to the second and third counts, and overruled as to the first count. This count charged the plaintiff in error with having unlawfully neglected at San Francisco, Cal., to detain, on board the Tucapel, Rodrego Marquez, an alien not entitled to land, and by reason of such neglect the alien escaped from the vessel and landed in the United States. The defendant entered his plea of not guilty, and the case was tried before the court with a jury, upon the following agreed statement of facts: "(1) Defendant at all the times herein stated was, and now is, master of the British steamship Tucapel, belonging to the Pacific Steam Navigation Company, then plying as a common carrier between San Francisco and Mexican and South and Central American ports, on the Pacific Coast. (2) On the morning of the 25th day of June, 1901, the Tucapel, carrying passengers, a cargo of freight, and the United States mail, destined for San Francisco and elsewhere, arrived off the port of Mazatlan, Mexico, on her way north, and was anchored at a considerable distance there, off shore. She was thereupon surrounded and boarded by native boatmen and peddlers, who coming out to the vessel in small boats or cascoes, according to the practice prevailing at this and other southern ports, came on board the vessel to sell fruits and other wares to passengers and members of the crew. (3) Among these boatmen and peddlers was Rodrego Marquez, a Mexican. (4) After remaining at anchor off Mazatlan for several hours, and completing the transaction of her business there, the vessel proceeded on her journey north, on the afternoon of said day, traveling at her usual rate of speed, of from twelve to fourteen knots an hour. She had proceeded upon her voyage about ten miles, when one of the ship's officers reported to defendant, as master of the said vessel, that Marquez had been by accident overcarried, and was then on board the Tucapel. Defendant thereupon interviewed the Mexican, who begged him to stop the vessel, return to Mazatlan, and land him there, inasmuch as he had not noticed while plying his business on the steamer that she was under way until he had returned to her deck, a short time before

his case had been reported to defendant. Marquez protested that he did not wish to be carried to the United States, but defendant declined to accede to his request, and then return to Mazatlan, especially as it was a matter of common occurrence for a native boatman or peddler to be overcarried from one port or place to another on the South Pacific Coast, but he promised Marquez, however, to bring him back to his native place on the return voyage of the steamer, and, without being placed on the crew list, he was set at work shoveling coal as a work-away on the voyage north. (5) The Tucapel arrived at San Francisco, June 30, 1901, with Rodrego Marquez on board, who then said he did not want to land, but to be returned to Mazatlan as soon as possible. (6) On her arrival at San Francisco the vessel was boarded by an immigration inspector, who notified defendant not to land Marquez until permission therefor had been obtained from the commissioner of immigration at the port last named, said Marquez having no financial means whatsoever at San Francisco. (7) Marquez was not locked up nor placed in irons on board the steamer, and on the night of the 4th of July, 1901, and just before the steamer left San Francisco on her southern route, he left the vessel without the knowledge or permission of defendant, or of any of his officers, or of the officers of the immigration bureau here. (8) Defendant at no time had any intention or wish to land Rodrego Marquez at this or any other port or place in the United States, and, as far as defendant could learn, said Marquez had at no time any intention of coming to or landing in the United States. (9) The Pacific Steam Navigation Company has withdrawn its steamers from the San Francisco route, and they, including the steamer Tucapel, are now engaged exclusively in plying between ports and places on the South Pacific Coast, as far north as Panama. The steamer sailed from San Francisco for the last time February 10, 1902. The foregoing statement is subject to any objection thereto or to any part thereof by either plaintiff or defendant on the ground that the same is immaterial or irrelevant."

The defendant moved to strike out certain portions of the agreed statement of facts as immaterial and irrelevant, which motion was denied. After the facts agreed upon had been read to the jury, the defendant moved the court to instruct the jury to bring in a verdict for the defendant upon the following grounds: "(1) That the indictment fails to set out that Marquez was an alien immigrant under the act of 1891, under which the indictment was framed, which relates to foreign immigration, and therefore there can be no conviction unless the indictment has set forth that fact. (2) That the indictment fails further to state a cause of action, in that it does not show in what respect this alien, if an immigrant, was a person not lawfully entitled to enter the United States. It does not show in what respect this alien was included, if at all, in one of the interdicted classes. (3) For the reason that the facts as agreed and shown to the jury do not make a case for the government in that, among other reasons, it is not shown that Marquez was an alien immigrant, and it is not shown that he came to this country with the intention of coming here, but was involuntarily carried here."

This motion was denied. The court also declined to give certain instructions asked for by defendant, and gave other instructions to the jury, to all of which the defendant duly excepted. The jury returned a verdict of guilty, and the defendant was sentenced to pay a fine of $300. From this judgment the defendant brings a writ of error to this court.

There are 10 assignments of error, covering every ruling of the court below, but, as was said by counsel for the plaintiff in error, these assignments may be grouped into three classes, and pertain "(1) to the insufficiency of the first count of the indictment as a statement of the commission by plaintiff in error of an offense against the laws of the United States; (2) to the proper construction of section 10 of the act of March 3, 1891, under which the indictment was framed, which refers to immigrants and no others; and (3) to the insufficiency of the evidence to sustain the verdict."

Page, McCutchen & Knight, for plaintiff in error.

Marshall B. Woodworth, U. S. Atty., and Benjamin L. McKinley, Asst. U. S. Atty.

Before GILBERT and ROSS, Circuit Judges, and HAWLEY, District Judge.

HAWLEY, District Judge (after stating the facts as above). If the alien Marquez was not a person permitted by law to enter or remain in the United States, it is manifest that the plaintiff in error did not exercise reasonable diligence, and was clearly guilty of negligence in failing to detain said alien on the vessel. The good intention, or absence of any wrongful intention, on the part of plaintiff in error, would constitute no excuse whatever for his negligence.

The real question presented for our determination is whether or not the agreed statement of facts is sufficient to show that the alien Marquez belonged to one of the classes of persons whose admission into the United States is excluded by the provisions of the act of March 3, 1891, c. 551, 26 Stat. 1084 [U. S. Comp. St. 1901, p. 1299]. It will be observed that this act is "An amendment to the various acts relative to immigration and the importation of aliens under contract or agreement to perform labor." In some particulars it was amended by "An act to facilitate the enforcement of the immigration and contract labor laws of the United States," approved March 3, 1893 (27 Stat. 569, c. 206 [U. S. Comp. St. 1901, p. 1300]); and again March 3, 1903, by "An act to regulate the immigration of aliens into the United States" (32 Stat. 1213, c. 1012 [U. S. Comp. St. Supp. 1903, p. 170]).

All these acts, as was the act in regard to contract labor (Act Feb. 26, 1885, c. 164, 23 Stat. 332 [U. S. Comp. St. 1901, p. 1290]), are highly penal in their character, and should be so construed as to bring within their condemnation only those who are shown, by direct and positive averments and clear proof, to be embraced within the terms of the law. They should be construed as a whole, and not by selecting particular words or sections, and interpreting them according to their strict letter. United States v. Gay, 95 Fed. 226, 37 C. C. A. 46. They should not be so construed as to include cases which, although within the letter, are not within the spirit of the law. All laws should receive a sensible construction. General terms contained therein should be so limited in their application as not to lead to injustice, oppression, or absurd consequences. Tsoi Sim v. United States, 116 Fed. 920, 926, 54 C. C. A. 154, and authorities there cited.

The act under consideration provides in section 1 that:

"The following classes of aliens shall be excluded from admission into the United States, in accordance with the existing acts regulating immigration, other than those concerning Chinese laborers: All idiots, insane persons, paupers or persons likely to become a public charge, persons suffering from a loathsome or a dangerous contagious disease, persons who have been convicted of a felony or other infamous crime or misdemeanor involving moral turpitude, polygamists, and also any person whose ticket or passage is paid for with the money of another or who is assisted by others to come, unless it is affirmatively and satisfactorily shown on special inquiry that such person does not belong to one of the foregoing excluded classes."

We are of opinion that this act clearly relates to immigration, and is leveled only against immigrants, although neither of these words

is expressly mentioned in section 10 of the act. Section 3 excludes the encouragement of immigration to this country of aliens by promise of employment. Section 4 makes it unlawful for steamships or transportation companies or vessel owners, by writing or otherwise, to solicit or encourage the immigration of aliens into the United States except in certain specified particulars. Section 6 forbids the bringing into the United States of any aliens not lawfully entitled to enter, and punishes the offense. Section 8 provides that upon the arrival by water of alien immigrants at any port it shall be the duty of the master of the vessel bringing them to make report to the proper inspection officers of the name, nationality, and last residence of every such alien before any of them are landed. The inspection officers are thereupon required to inspect all such aliens, either on board the vessel upon which they have arrived or at some other definite place.

This brings us to section 10, under which the plaintiff in error was indicted. It reads as follows:

"That all aliens who may unlawfully come to the United States shall, if practicable, be immediately sent back on the vessel by which they were brought in. The cost of their maintenance while on land, as well as the expense of the return of such aliens, shall be borne by the owner or owners of the vessel on which such aliens came; and if any master, agent, consignee, or owner of such vessel shall refuse to receive back on board the vessel such aliens, or shall neglect to detain them thereon, or shall refuse or neglect to return them to the port from which they came, or to pay the cost of their maintenance while on land, such master, agent, consignee, or owner shall be deemed guilty of a misdemeanor, and shall be punished by a fine not less than three hundred dollars for each and every offense; and any such vessel shall not have clearance from any port of the United States while any such fine is unpaid."

Was Marquez an alien immigrant, within the true intent and meaning of the act of Congress? The case is sui generis. It stands upon a different footing, and is presented by a different state of facts, from any of the previous cases that have found their way into the courts.

In Warren v. United States, 58 Fed. 559, 7 C. C. A. 368, which is the principal case here relied upon by the defendant in error, it was there admitted that certain aliens named in the indictment voluntarily embarked for the United States from a foreign port upon the vessel Kansas, and did unlawfully come to the United States upon and by means of said vessel. The plaintiff in error there was the agent of the vessel, and his only contention was that there was no negligence or neglect in detaining the said aliens, and that they escaped without any negligence or neglect on his part. No question was there discussed bearing upon the point under consideration. In reviewing the various sections of the act of March 3, 1891, the court very properly said "that the intention of Congress was the absolute exclusion from this country of all immigrants of the classes named in the act." Here the controlling question is whether the alien Marquez is included in the "classes named in the act."

Was he an alien immigrant, within the meaning of those words as used in the act of Congress? In searching for the intent of Congress in the passage of this act, we must first examine the language

that has been used. Lawmakers must be presumed to know the ordinary meaning of the words used by them. The courts are not invested with any function of legislation. They simply seek to ascertain the intent and will of the legislators. They cannot make any "judicial addition" to the language of the statute. United States v. Goldenberg, 168 U. S. 95, 103, 18 Sup. Ct. 3, 42 L. Ed. 394.

The standard dictionaries give the meaning of the word "immigrant": "A person that removes into a country for the purpose of permanent residence." "Immigrate": "To remove into a country for the purpose of permanent residence." "Immigration": "The passing or removing into a country for the purpose of permanent residence." See Webster's Dictionary and Century Dictionary. This meaning should be applied to the words as used in the statute in order to discover the intent of Congress. This interpretation has been given by the courts to the language used in the act under consideration.

In United States v. Sandrey (C. C.) 48 Fed. 550, the court, after reviewing the several sections of the act, said:

"As clearly appears, the act deals only with the importation of aliens under contract to labor and alien immigration. It is only with regard to alien immigrants that the act imposes duties upon the masters and agents of vessels, or provides penalties for the nonperformance of duties by such masters and agents. An alien immigrant to the United States is an alien who comes or removes into the United States for the purpose of permanent residence. Aliens composing the crews of vessels visiting our seaports are in no sense immigrants, and, as the review of the statute as above shows, are in no wise affected by the law in question. With regard to them, the said law imposes no duties or penalties upon the masters and agents of vessels."

In United States v. Burke (C. C.) 99 Fed. 895, the court reviewed the different sections of the act, and in the course of the opinion said:

"The legislation contained in the various statutes that have been passed relating to immigration is clearly directed against the immigration into this country of certain classes of persons who come in with the intent to enter into and become a part of the mass of its citizenship or population. Immigration is defined to be the entering into a country with the intention of residing in it. The earlier statutes merely prohibit contract laborers being brought in. The later ones prohibit the bringing in of immigrants—persons who come into this country with the intention of remaining, or fixing a residence here—and who are calculated to become a charge upon the country, or who are unfit, on account of moral character, previous conviction of crime, or disease, to be admitted as citizens."

Where the intent of the statute is plain, nothing is left to construction; but, where the mind of the court must labor to discover the design of the Legislature, it seizes upon everything from which it can be derived. In this search courts should not overlook nor ignore the well-known canon of construction, which often proves to be a safe guide in determining the meaning of statutes. The rule is universal in cases of this character that the evil which Congress intended to remedy must be looked at. All the circumstances, conditions, and contemporaneous events which induced Congress to pass the law must be considered and given due weight. We have already sufficiently stated the objects and purposes of the law in this particular.

One of the best-reasoned cases to be found upon this subject is the Holy Trinity Church v. United States, 143 U. S. 457, 12 Sup. Ct. 511, 36 L. Ed. 226 (cited and referred to in Tsoi Sim v. United States, supra), where the court was called upon to construe the act of February 26, 1885, "to prohibit the immigration of foreigners or aliens under contract or agreement to perform labor in the United States." See, also, United States v. Craig (C. C.) 28 Fed. 795, 798; United States v. Borneman (D. C.) 41 Fed. 751; United States v. Gay, 95 Fed. 226, 230, 37 C. C. A. 46.

From the agreed statement of facts it does not appear that Marquez was an alien immigrant who left a foreign shore to come to the United States for the purpose of becoming a permanent resident here. When he had completed the business which he went upon the vessel to perform, he started to return on shore, but found that the steamer had left. He demanded to be returned to Mazatlan. He protested against coming to the United States. The plaintiff in error refused his demand, but promised him to take him back to Mazatlan on the return voyage of the steamer. He was not required to pay his passage, but was set to work shoveling coal, without being put upon the crew list. The plaintiff in error owed him no duty other than that he promised to perform. When the vessel arrived at San Francisco on June 30, 1901, Marquez stated that he did not want to leave the vessel, but wished "to be returned to Mazatlan as soon as possible." There is no pretense of any fraud. All the acts and agreements between the plaintiff in error and Marquez affirmatively appear to have been in the utmost good faith, and not for the purpose of evading any law.

Notwithstanding the notification given to the plaintiff in error not to land Marquez until permission was obtained from the commissioner of immigration, Marquez was not an immigrant, within the meaning and intent of the act under consideration, and the plaintiff in error was not required to put him in irons, or keep him under guard, to secure his return upon the steamer. The plaintiff in error was not tried upon an indictment charging him with preventing an immigration officer from performing his duty.

The judgment of the District Court is reversed.