## UNITED STATES v. AULTMAN CO.

### (District Court, N. D. Ohio, E. D. February 19, 1906.)

### No. 3,118.

ALIENS—CONTRACT LABOR LAW— PERSONS TO WHOM APPLICABLE.

The alien contract labor law, as amended in 1903 (Act March 3, 1903, 32 Stat. 1214, § 4, c. 1012 [U. S. Comp. St. Supp. 1905, p. 277]), does not apply to a man who entered the United States as an immigrant from Germany when young and remained continuously domiciled and working in this country for 12 or more years, although without becoming naturalized, and who then went temporarily into Canada, where he had been for two weeks when the contract alleged to be in violation of the statute was made.

[Ed. Note.—Importation of contract labor, see note to United States v. Parsons, 66 C. C. A. 133.]

At Law. The plaintiff and defendant having rested, the testimony being all before the court, counsel for the defendant moved the court for a nonsuit, and that the court direct the jury to return a verdict for the defendant.

John J. Sullivan, U. S. Atty.

Lynch, Day & Day and Kline, Tolles & Goff, for defendant.

TAYLER, District Judge (orally). This action is based on sections 4 and 5 of the act to regulate the immigration of aliens into the United States. Act March 3, 1903, c. 1012, 32 Stat. 1214 [U. S. Comp. St. Supp. 1905, p. 277]. The claim is that the defendant, in violation of that law, solicited and procured the importation of one Hermann, an alien, from Canada. Since the observation of the district attorney as to changes in the law since its original passage, or since the time when the decisions referred to were rendered, I have looked at the statute with a view of finding out what changes were made as respects the question involved in this case, but I do not find that there has been any such change. There have been advances made in the law, with a view of more fully carrying out its purposes, and especially the law has been carefully amended since those decisions. This is an important circumstance, as will hereafter be noted. Section 4 provides that it shall be unlawful for any person, company, partnership, or corporation, in any manner whatsoever, to prepay the transportation or in any way to assist or encourage the importation or migration of any alien into the United States, in pursuance of any offer, solicitation, promise, or agreement, parol or special, express or implied, made previous to the importation of such alien, to perform labor or service of any kind, skilled or unskilled, in the United States. The law has been since its original passage just as it is now in section 4, except that it adds unskilled labor to the classes covered by it, and has more carefully disclosed the unlawful methods by which the purpose sought to be accomplished may be carried out, by adding the word "solicitation." So that section 4 in its present form represents the results of the experience of intelligent men, determined to see that the purpose of the law was expressed in the

iaw itself, and carried out. Then section 5 provides, in substance, for the penalty which shall be incurred for every violation of any of the provisions of section 4 of this act.

Now, the statute seems to be clear and explicit in its terms; and it was not until the witness Hermann had testified that he had come into this country from Germany in 1891, when he was quite young, and had remained constantly in this country, working at his trade almost all the time, never outside of the country until a couple of weeks before this transaction occurred which is the subject of this petition, that my attention was arrested and directed to the question as to whether or not such a person was included within the terms of this act. I say "arrested," because this provision of the law has been familiar to me for a long time, though not in its exact phraseology, and I have been especially familiar with, and deeply interested in, the purpose for which the law was passed, and had a familiarity, greater or less, with several of the amendments, including the last one, which was passed in March, 1903. So, as I say, my attention was arrested by that situation, and I tried, as well as I could, to reason out the proposition whether or not a man with this history was to be included within the provisions of this law, and a contract made with him, under the circumstances that existed here, prohibited by the law. Now, I thought that I understood what the purpose of this law was. It was intended, primarily, to prevent persons who are dissatisfied with the wage level of this country going into some other country, where the wage level was lower and where the promise of higher wages in this country would be extremely attractive, and where, on that account, it would be easy to make a contract with a person thus working for lower wages to come into this country and work for higher wages, with the result that, by making a contract at a rate of wages higher than the rate at which the alien was working, and lower than the prevailing, and through our civilization the necessarily prevailing rate of wages, the wage level in this country would be demoralized; and, as the wage level in this country determines the level of civilization in this country, very serious wrong would be done, not merely to labor, but to society, which, in its units, is almost all made up of labor. That was the general condition of things which demanded this legislation as a protection to society, and to the civilization which depends upon the amount that men earn, and therefore the amount that men spend. We are all familiar with the rule that, where it is possible to do so, a law must be construed in accordance with its spirit, and that a penal law is to be strictly construed. Those are elementary propositions.

The first case that I found during the recess was the case of Moffitt v. United States, 128 Fed. 375, 63 C. C. A. 117. That was a case under the immigration law; and the syllabus, which fairly states the substance of the decision in that respect, says:

"The immigration laws of the United States, in so far as relates to punishment for their violation, are highly penal, and are to be strictly construed, and their provisions applied only to cases clearly within their terms and their spirit, construed as a whole."

"We are of opinion," says the Circuit Court of Appeals in the text, "that this act clearly relates to immigration, and is leveled only against immigrants, although neither of these words is expressly mentioned in section 10 of the act. Section 3 excludes the encouragement of immigration to this country of aliens by promise of employment. Section 4 makes it unlawful for steamships or transportation companies or vessel owners, by writing or otherwise, to solicit or encourage the immigration of aliens into the United States, except in certain specified particulars. Section 6 forbids the bringing into the United States of any aliens not lawfully entitled to enter, and punishes the offense," and so on. And on page 380 of 128 Fed., and page 122 of 63 C. C. A.:

> "Where the intent of the statute is plain, nothing is left to construction; but where the mind of the court must labor to discover the design of the Legislature it seizes upon everything from which it can be derived. In this search courts should not overlook nor ignore the well-known canon of construction, which often proves to be a safe guide in determining the meaning of the statutes. The rule is universal, in cases of this character, that the evil which Congress intended to remedy must be looked at. All the circumstances, conditions, and contemporaneous events which induced Congress to pass the law must be considered and given due weight."

Now the law, in respect to its application, what persons it applied to, has been considered in that sense in two aspects: First, to define what kind of persons, measured by their employment, are included; and, second, to define what is meant by aliens or immigrants. Those two phases of qualities which must inhere in the person whose contract is subject to consideration have been considered. On the first proposition we have the case of Holy Trinity Church v. United States, 143 U. S. 457, 12 Sup. Ct. 511, 36 L. Ed. 226. That case passed upon the question of the kind of employment or work which the person who it was said was being imported in violation of law was engaged in. That is not our question here, but naturally the principles of law that govern that case would govern here. This is a very instructive and well-considered opinion by Mr. Justice Brewer, in which he held that a minister of a church was not included within the law. He is now excluded from its operation by the amendment to the law; but at that time there was no such exclusion. A contract had been made in England with a minister to go to New York and take charge of the spiritual affairs of a certain church. The courts below held that the contract was in violation of this law, and the case went to the Supreme Court for determination. Justice Brewer says (on page 458 of 143 U. S., and page 511 of 12 Sup. Ct. [36 L. Ed. 226]):

> "It must be conceded that the act of the corporation (that is, of the church corporation) is within the letter of this section, for the relation of rector to his church is one of service, and implies labor on the one side with compensation on the other. Not only are the general words 'labor' and 'service' both used, but also, as it were to guard against any narrow interpretation and emphasize a breadth of meaning, to them is added 'of any kind'; and, further, as noticed by the circuit judge in his opinion, the fifth section, which makes specific exceptions, among them professional actors, artists, lecturers, singers, and domestic servants, strengthens the idea that every other kind of labor and service was intended to be reached by the first section. While there is great force in this reasoning, we can-

not think Congress intended to denounce with penalties a transaction like that in the present case. It is a familiar rule that a thing may be within the letter of the statute and yet not within the statute, because not within its spirit, nor within the intention of its makers. This has been often asserted, and the reports are full of cases illustrating its application. This is not the substitution of the will of the judge for that of the legislator, for frequently words of general meaning are used in a statute, words broad enough to include an act ,in question, and yet a consideration of the whole legislation, or of the circumstances surrounding its enactment, or of the absurd results which follow from giving such broad meaning to the words, makes it unreasonable to believe that the legislator intended to include the particular act."

Continuing the reasoning (on page 463 of 143 U. S., and page 513 of 12 Sup. Ct. [36 L. Ed. 226]), Justice Brewer says:

"Again, another guide to the meaning of a statute is found in the evil which it is designed to remedy; and for this the court properly looks at contemporaneous events, the situation as it existed, and as it was pressed upon the attention of the legislative body. The situation which called for this statute was briefly, but fully, stated by Mr. Justice Brown when, as district judge, he decided the case of United States v. Craig (C. C.) 28 Fed. 795, 798: 'The motives and history of the act are matters of common knowledge. It had become the practice for large capitalists in this country to contract with their agents abroad for the shipment of great numbers of an ignorant and servile class of foreign laborers, under contracts, by which the employer agreed, upon the one hand, to prepay their passage, while, upon the other hand, the laborers agreed to work after their arrival for a certain time at low wages. The effect of this was to break down the labor market, and to reduce other laborers engaged in like occupation to the level of the assisted immigrant. The evil finally became so flagrant that an appeal was made to Congress for relief by the passage of the act in question, the design of which was to raise the standard of foreign immigrants, and to discountenance the migration of those who had not sufficient means in their own hands, or those of their friends, to pay their passage.'"

So, also, we find quoted in this opinion a part of the report made by the committee of the House which recommended the passage of this very legislation in the Forty-Eighth Congress. That committee said:

"It seeks to restrain and prohibit the immigration or importation of laborers who would have never seen our shores but for the inducements and allurements of men whose only object is to obtain labor at the lowest possible rate, regardless of the social and material well-being of our own citizens, and regardless of the evil consequences which result to American laborers from such immigration. This class of immigrants care nothing about our institutions, and in many instances never even heard of them. They are men whose passage is paid by the importers. They come here under contract to labor for a certain number of years. They are ignorant of our social condition, and that they may remain so they are isolated and prevented from coming into contact with Americans. They are generally from the lowest social stratum, and live upon the coarsest food and in hovels of a character before unknown to American workmen. They, as a rule, do not become citizens, and are certainly not a desirable acquisition to the body politic. The inevitable tendency of their presence among us is to degrade American labor, and to reduce it to the level of the imported pauper labor."

Ending the quotation, and continuing with the language of Mr. Justice Brewer, is this sentence:

"We find, therefore, that the title of this act, the evil which was intended to be remedied, the circumstances surrounding the appeal to Congress, the reports of the committee of each house, all concur in affirming that the intent of Congress was simply to stay the influx of this cheap unskilled labor."

Now, I must confess that, having read so much of that opinion, I could not escape the conviction that the Supreme Court of the United States would have greater difficulty in excluding from the language of that act a minister than it would have to exclude a person like Hermann from the act. It seems to me that the reason that was applied by the Supreme Court in that case would apply with double force to the case that we have here; and to that conclusion, subject to further reflection and the argument that might be presented, I had come when my attention was called to what I had not had time to find—these cases where the United States courts have held, both in a contract labor case and in other cases where the definition of the persons who were included within this act was made, that a person who had come into this country, who had migrated to this country, had become a part of the wage-earning body of this country, in a sense had assimilated to our society, who, in a word, had become a resident and domiciled here, although not naturalized, could not be said to be a person with whom to make such a contract as here charged would be to violate this contract labor law. But we find that in many instances the courts have so held.

In Re Maiola (C. C.) 67 Fed. 114, Judge Lacombe held, as it is stated in the syllabus:

"The statutes of the United States relating to the exclusion of contract laborers, including the act of March 3, 1891, making the decision of the immigration officers final as to the right of such laborers to land, are directed solely against alien immigrants, not against alien residents returning after a temporary absence; and the courts, therefore, have power, upon habeas corpus, to inquire whether one who is refused admission to the country by the immigration officers is or is not an immigrant, and so within the jurisdiction of such officers.

"An unmarried man, who has immigrated to the United States in 1892, with the intention of making his home there, has remained about two years, working at his trade, and then, being taken ill, has returned to his native country, remained about 10 months, doing no work, and then in 1895 returns to the United States—is not an immigrant on his return in 1895."

There are three other cases cited to the same effect as to the definition of an immigrant. They are not contract labor cases, but they are under the same general law, the title of which I quoted at the outset.

In Re Panzara et al., 51 Fed. 275, it is held by the District Court for the Eastern District of New York that:

"The power of the federal superintendent of immigration to return passengers is confined to 'alien immigrants,' and the question whether persons ordered to be returned are of that description is jurisdictional, and may be determined by the courts on habeas corpus. One who is a resident of the United States, though of foreign birth, and not naturalized, and who is returning from a visit to the country of his birth, is not an alien immigrant within the meaning of the laws regulating immigration."

In Re Martorelli, 63 Fed. 437, Judge Lacombe, in the Circuit Court for the Southern District of New York, held:

"The acts regulating immigration, existing when Act March 3, 1891, was passed, refer to aliens who are imported into or who migrate to this country, and do not exclude a person already resident here, though not naturalized, who temporarily departs, with the intention to return."

The District Court for the Northern District of California, in Re Ota, 96 Fed. 487, held:

"The provisions of Act March 3, 1891, 26 Stat. 1084, c. 551 [U. S. Comp. St. 1901, p. 1294], excluding certain classes of aliens from admission to the United States, and requiring their deportation, do not apply to aliens domiciled in this country, and who are returning thereto after a temporary absence."

I must differ from these several judges who have defined this law and declared that such a person is not within the terms of the law, if I find that Hermann comes within it.

The facts in this case are infinitely stronger than the facts in any of the cases from which I have just quoted. In this case nobody would pretend that Hermann ever intended to go back to Germany to live, or that he was any less absorbed into the body of American workmen than anybody who had always lived here. He came here when he was about 17 years of age. He had worked some at the trade of coremaker, he said, before he came over; but he did not get to work at that in this country immediately, whatever he may have known about it before. But from 1891, when, a German boy, he landed in New York like any other immigrant, and was reported as an immigrant from Germany, from that moment until two weeks before he made this contract, if he made any at that time, until about two weeks before the 31st of July, 1902, he had never set foot outside of this country. From the age of 17 to 30 he had worked in this country; and, then, because he had been working as a strikebreaker, he went to Canada to help break a strike there, and there remained, as he said, a short time, two weeks, when he was called upon to assist in breaking a strike down at Canton. Now, was he an immigrant when he came over from Canada? Could the immigrant officers have stopped him? The unbroken current of authority is that he was not an immigrant within the meaning of this statute. I doubt if he would be an immigrant within the meaning of any statute. If he belonged anywhere, he belonged in this country, whatever technical relation he may have sustained to the Emperor of Germany.

Counsel refers to the fact that he was a strike-breaker, and that they are the kind of people that this legislation was intended to keep out. It is not worth while to discuss whether the work of the strikebreaker is virtuous, or the contrary. The legislation was not intended to touch the case of strike-breakers in the sense in which that argument was made. It was intended to reach strike-breakers, in the way of cheaper labor coming here at lower wages, as it would demoralize labor here, and most seriously and grievously affect the well-being of this country. But it was not intended to touch strikebreakers in the sense in which these men were strike-breakers, whatever we may think of such a trade, if there is such a trade.

The last of the four cases defining an alien immigrant was decided December 1, 1899. Since that time the law has been amended, especially by the act of March 3, 1903; and it is a familiar principle that when a certain construction has been given to a statute, especially when its general language has been qualified and subsequent legislation has not undertaken to change the language so as to meet with the judicial definition, added persuasiveness is given to the construction of the law which the courts have put upon it. That is to say, if Congress intended to give a wider application to the law than the courts had given to it, it is reasonable to assume that it would have so legislated when it came to amend the law after the decisions were made public.

I have no sort of doubt at all that, considering the title of this act, considering its various provisions, considering the conditions that brought about its passage, considering the state of the public mind regarding it, and its history, not to mention the other things which are of themselves conclusive, the decisions of the United States courts and the holding of the Supreme Court in the Holy Trinity Church Case—this person Hermann was not in 1903 a person with whom the act referred to prohibited the making of a contract. So that it would not make any difference whether a contract was made, or whether the defendant knew he was an alien in the sense in which he was an alien. It would not make any difference what the fact is as to that. The law could not be violated as respects this particular person.

And for that reason, therefore, gentlemen of the jury, as no question of fact exists for your consideration, but only this question of law upon admitted facts of the case, and there is no confusion or uncertainty about the facts in so far as they relate to the proposition I have just determined, it will be your duty to return a verdict for the defendant, which is accordingly done.