## Ex parte PETTERSON.

(District Court, D. Minnesota, Fourth Division. November 24, 1908.)

1. HABEAS CORPUS (§ 23*)—SCOPE OF WRIT—ALIEN DEPORTATION PROCEEDINGS.

   While a writ of habeas corpus cannot be employed to perform the function of a writ of error or appeal, federal courts have jurisdiction thereon to grant relief to a party aggrieved by any action by the head or one of the subordinate officials of the department directing the deportation of an alien, when the evidence adduced before such official and on which he assumes to act is uncontradicted and establishes, as a matter of law, that the case is not within the statute.

   [Ed. Note.—For other cases, see Habeas Corpus, Dec. Dig. § 23.*
   Jurisdiction of federal courts, see note to In re Huse, 25 C. C. A. 4.]

2. ALIENS (§ 46*)—DEPORTATION—DOMICILE.

   Under Act Cong. Feb. 20, 1907, c. 1134, 34 Stat. 898 (U. S. Comp. St. Supp. 1907, p. 389), providing for the deportation of certain classes of aliens not entitled to enter the United States, the fact that an alien ordered to be deported had once in good faith acquired a residence in the United States prior to her return after a temporary absence in a foreign country did not entitle her to enter on her return and remain in the United States.

   [Ed. Note.—For other cases, see Aliens, Cent. Dig. § 105; Dec. Dig. § 46.*]

3. DOMICILE (§ 1*)—DEFINITION.

   The domicile of a person, in a strict legal sense, is where he has his true, fixed, permanent home and principal establishment, to which whenever he is absent he has an intention of returning. The word "domicile" is nearly synonymous with "home."

   [Ed. Note.—For other cases, see Domicile, Cent. Dig. § 1; Dec. Dig. § 1.*
   For other definitions, see Words and Phrases, vol. 3, pp. 2168–2179; vol. 8, pp. 7641, 7642.]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

**4. DOMICILE (§ 5*)—INFANTS.**

During minority the domicile of an infant is that of the person from whom he took his domicile of origin, and changes only with the domicile of that person.

[Ed. Note.—For other cases, see Domicile, Cent. Dig. § 27; Dec. Dig. § 5.*]

**5. COURTS (§ 362*)—ALIENS—AGE—WHAT LAW GOVERNS—"MINOR."**

Section 721, Rev. St. (U. S. Comp. St. 1901, p. 581), declaring that the laws of the several states, except when the Constitution, treaties, or statutes of the United States otherwise require or provide, shall be regarded as the rules of decisions in trials at common law in the courts of the United States in cases where they apply, does not require the recognition and application of state statutes in an examination or proceedings before an immigration officer for the purpose of determining the right of an alien to enter or to remain in the United States under our immigration statutes. Section 3636 of the Revised Laws of Minnesota of 1905, providing that the word "minor" shall mean a male under 21 or a female under 18 years of age, is not, therefore, controlling or binding upon such immigration officer, when conducting such a proceeding, in determining the question whether an alien female attains her majority when she reaches the age of 18 years; but such officer should recognize and follow the common-law rule, which fixes the age of majority at 21 for both sexes.

[Ed. Note.—For other cases, see Courts, Cent. Dig. §§ 939–941; Dec. Dig. § 362.*

For other definitions, see Words and Phrases, vol. 5, pp. 4527–4528.]

**6. DOMICILE (§ 4*)—ACQUISITION—ALIENS.**

Petitioner came to the United States from Sweden when she was about 16 years old. She worked for a short time as a domestic servant. When she was about 18 she entered a house of prostitution in St. Paul, Minn., and there remained for 2½ years, when she became an inmate of a similar adjoining house, where she stayed 6 or 7 months, and then returned to the first house, where she remained a week. She was 21 years old on December 1, 1906, and sailed from New York for Sweden to "visit her home" on the 5th. She intended, when she sailed, to return to the United States, but it was not shown that she intended to return to St. Paul or any other particular place. Prior to September 12, 1907, she wrote to her former mistress for a ticket and passage money to return, which being sent to her, she arrived in New York on September 12, 1907, and went directly to the house of such mistress, where she remained as an inmate until her arrest. *Held*, that she had not acquired a domicile in the United States prior to her leaving the country.

[Ed. Note.—For other cases, see Domicile, Cent. Dig. § 15; Dec. Dig. § 4.*]

## Habeas Corpus.

On the 31st day of July, 1908, the petitioner herein was arrested in the city of Minneapolis, Minn., by Marcus Braun, United States immigrant inspector of St. Paul, upon telegraphic instructions received by him on the same day from William R. Wheeler, Assistant Secretary of the Department of Commerce and Labor, which instructions were as follows:

"Arroup (Arrest following named alien and bring before yourself for hearing, forwarding record of proceedings to the Department) Evalda alias Midget Petterson, Swedish prostitute, submitting case through Minneapolis Office and securing stenographer from there. Expenses detention authorized.

"[Signed]                    Wheeler, Assistant Secretary."

She was thereupon brought before Immigrant Inspector Marcus Braun, at the post office building in the city of Minneapolis, the telegraphic communication from the Assistant Secretary of Commerce and Labor was then read to her, and she was informed of her right to employ counsel, which she declined to exercise at that time. She was then sworn, and testified, in substance, as follows: "I was born at Carlsburg, Sweden, and first came to the

United States in 1901. I will be 23 years of age on the 1st of December, 1908. When I first came to America in 1901 I worked for a time as a servant girl; on the 5th of December, 1906, I left New York on the steamship Oceanic, for the purpose of visiting my home in Sweden. Immediately before the last-named date I had been an inmate for six or seven months of a house of prostitution kept by one Nellie Reed, at 165 South Washington street, St. Paul. Before I went to the Reed house I had been an inmate for 2½ years of a house of prostitution kept by one Dottie Thorne at 163 South Washington street, in the city of St. Paul. I have never been married, and when I returned to Sweden in December, 1906, I went there for the purpose of visiting my home, with the intention of coming back to this country. When I got ready to come back to America I wrote to Miss Thorne, stating that I desired to come back, and requested her to send me a ticket. Just before returning to Sweden in December, 1906, I had been back in the house of Miss Dottie Thorne for about one week. Miss Thorne sent me a ticket and some money, the ticket and money amounting to $113. Upon my return to this country I came over on the steamship Teutonic, and landed in New York on the 12th of September, 1907. From New York I came direct to St. Paul, and went at once to the house of Miss Dottie Thorne, 163 South Washington street, where I lived as an inmate of such house of prostitution until my arrest on the 31st day of July of the present year. I have never been naturalized, and am an alien." There was no other testimony offered or received, at the hearing before Immigrant Inspector Braun, than the testimony of the petitioner as above set forth.

Upon the conclusion of these proceedings before the inspector, a transcript of the record was forwarded by the immigration officers to the Secretary of Commerce and Labor at Washington; and on the 4th day of August 1908, a warrant was duly issued by the Assistant Secretary of Commerce and Labor, directed to Commissioner of Immigration Robert Watchhorn, at Ellis Island, N. Y., which warrant contained, among other things, the following recitals: "Whereas, from proofs submitted to me, after due hearing before Inspector Marcus Braun, at Minneapolis, Minn., I have become satisfied that Evalda, alias Midget Petterson, alien, who landed at the port of New York, N. Y., ex S. S. Teutonic, on the 12th day of September, 1907, is in this country in violation of the act of Congress approved February 20, 1907 (Act Feb. 20, 1907, c. 1134, 34 Stat. 898 [U. S. Comp. St. Supp. 1907, p. 389]) to wit: That the said alien is unlawfully in the United States, in that she is a prostitute, was such at the time of entry, and has been found practicing prostitution within three years subsequent to arrival; and whereas, the period of three years after landing has not elapsed: I, William R. Wheeler, Assistant Secretary of Commerce and Labor, by virtue of the power and authority vested in me by the laws of the United States, do hereby command you to return the said alien to the country whence she came, at the expense of the steamship company importing her." It was further provided in said warrant of deportation: "That the alien will be detained as a witness against her alleged importer and keeper until such time as her presence is no longer required, whereupon she will be delivered into your custody for deportation." On the 8th day of October, 1908, and while the petitioner was being held in custody by the immigration officers of the United States and the sheriff of Hennepin county in the county jail, under and pursuant to the authority contained in said warrant for deportation, a petition for a writ of habeas corpus was presented to this court. On the same day an order was made allowing the writ, and by consent of parties it was made returnable on the 13th day of October, 1908, whereupon the following proceedings were had: The petitioner was sworn in her own behalf, and examined by her counsel solely as to the manner of her arrest. No testimony was offered either by the petitioner or by the government relative to the domicile which it was claimed she had acquired in the United States prior to her return to Sweden on the 5th day of December, 1906. By consent of both parties, a copy of the testimony in the proceedings before Immigrant Inspector Braun on the 31st day of July, 1908, was received in evidence. The case was thereupon argued by counsel and submitted to the court for decision. After making the foregoing statement of facts, the court rendered the following opinion.

O. H. O'Neil, for petitioner.

C. C. Houpt, U. S. Atty., and J. M. Dickey, Asst. U. S. Atty.

PURDY, District Judge (after stating the facts as above). 1. The petitioner is now being held for deportation under a warrant issued by the Assistant Secretary of Commerce and Labor, under and pursuant to the authority contained in section 21 of the act of February 20, 1907, entitled "An act to regulate the immigration of aliens into the United States" (Act Feb. 20, 1907, c. 1134, 34 Stat. 905 [U. S. Comp. St. Supp. 1907, p. 402]), which section is in part as follows:

"Sec. 21. That in case the Secretary of Commerce and Labor shall be satisfied that an alien has been found in the United States in violation of this act, or that an alien is subject to deportation under the provisions of this act, or of any law of the United States, he shall cause such alien within a period of three years after landing or entry therein, to be taken into custody and returned to the country whence he came, as provided by section 20, of this act," etc.

It is contended by counsel for petitioner that the provisions of this act above quoted have no application to an alien who has acquired a domicile in the United States, and is returning to this country after a brief visit to the land of his birth, such visit having been made with no intention of abandoning the domicile that he had previously acquired; and it is further contended that this petitioner is shown by the record of the proceedings before the immigrant inspector to have been such an alien at the time of her second arrival in the United States.

A preliminary question has been suggested which must first be considered: Has this court authority in a habeas corpus case to examine the record of the proceedings before the immigrant inspector, for the purpose of ascertaining whether the Assistant Secretary of Commerce and Labor, in issuing his warrant for deportation, acted with respect to a matter over which he had jurisdiction? It is of course well settled by abundant authority that the writ of habeas corpus cannot be employed to perform the function of a writ of error or an appeal. There are, however, several recent decisions of the Supreme Court holding that the courts of the United States have jurisdiction to grant relief to a party aggrieved by any action by the head or one of the subordinate officials of a department, when the evidence adduced before such official, and upon which he assumes to act, is wholly uncontradicted, and shows beyond any room for dispute or doubt that the case in any view is beyond the statutes, and not covered or provided for by them. Gonzales v. Williams, 192 U. S. 1, 24 Sup. Ct. 177, 48 L. Ed. 317; American School of Magnetic Healing v. McAnnulty, 187 U. S. 94, 23 Sup. Ct. 33, 47 L. Ed. 90. Upon the authority of these cases— and many others might be cited—there can be no room for question that this court has authority to examine the record and the evidence upon which the Assistant Secretary of Commerce and Labor predicated his authority to issue his warrant for the deportation of the petitioner, for the sole purpose of ascertaining whether the evidence before that official, and upon which he assumed to act, showed beyond any room for dispute or doubt that this case is beyond the purview of the im-

migration statutes of the United States, and not covered or provided for by them.

2. The foundation of petitioner's claim of right to be discharged from custody is contained in the proposition that an alien who in good faith has acquired a residence in the United States may, upon his return after a temporary absence in a foreign country, pass our frontier and remain in the United States without interference or molestation by our immigration officers; in other words, that an alien who has once acquired a domicile in the United States has a right to leave and re-enter this country with the same freedom as a citizen of the United States, and that our present immigration laws, when properly construed, do not operate against such an alien. In support of this proposition, several federal decisions are cited construing our immigration laws, and the court is now urged to adopt the construction of our immigrant statutes, announced in these decisions, in the determination of this case. But a careful consideration of those authorities has failed to convince me that the immigration act of February 20, 1907, should be construed as exempting from its operation aliens, by reason of the fact that they had once acquired a domicile in the United States.

The cases in which this question was first considered arose under the immigration act of March 3, 1891, c. 551, 26 Stat. 1084 (U. S. Comp. St. 1901, p. 1294). In re Panzara et al. (D. C.) 51 Fed. 275; In re Martorelli (C. C.) 63 Fed. 437; In re Maiola (C. C.) 67 Fed. 114; In re Monaco (C. C.) 86 Fed. 117; In re Ota (D. C.) 96 Fed. 487; In re Moffitt, 128 Fed. 375, 63 C. C. A. 117. It is manifest, however, that these decisions should be given little, if any, weight in construing the provisions of the more recent acts regulating the immigration of aliens, for the reason that the act of March 3, 1891, referred in nearly all of its provisions to "alien immigrants," and the court held, in construing the scope of that statute, that Congress intended that it should operate only against such "aliens" as were "immigrants."

On March 3, 1903, Congress passed another act upon the same subject, entitled "An act to regulate the immigration of aliens to the United States." Act March 3, 1903, c. 1012, 32 Stat. 1213. This act, as far as the express language contained in the law is concerned, was directed against all aliens, without reference to the question as to whether or not the aliens were "immigrants"; while the title of the act of March 3, 1903, is substantially the same as the title of the act of March 3, 1891, the qualifying word "immigrant," as the same appeared in the original act, being omitted from the later enactment. Notwithstanding this change in the immigrant law of 1903, several of the federal courts have held that the act was not intended by Congress to prohibit the objectionable classes of aliens enumerated in section 2 of the act from re-entering the United States when once they had acquired a domicile herein. In the following cases such interpretation of the act of March 3, 1903, has been adopted by the courts: In re Buchsbaum (D. C.) 141 Fed. 221; Rodgers, U. S. Commissioner of Immigration, et al. v. U. S. ex rel. Buchsbaum, 152 Fed. 346, 81 C. C. A. 454; U. S. v. Aultman (D. C.) 143 Fed. 922, the same case affirmed in 148 Fed. 1022, 79 C. C. A. 457; U. S. v. Nakashima, 160 Fed. 842, 87 C. C. A. 646. Without attempting an elaborate statement

of the reasons which have influenced me in arriving at a different conclusion respecting the interpretation and scope of this law, I shall content myself with a brief enumeration of several points which, in my opinion, render the construction which is supported by the foregoing decisions at least doubtful.

In the Nakashima Case the Circuit Court of Appeals of the Ninth Circuit assigns the following reason why aliens who having acquired a domicile in the United States, although belonging to the excluded classes, should not be considered as within the inhibitions of the immigration law of 1903:

"But aliens have always been allowed to reside in the United States and acquire property there, while at the same time maintaining their citizenship in the country from whence they came, and their right to return to the United States, after having temporarily left the same with the intention to return, has always been recognized. It is not to be presumed that Congress intended to change the whole trend of its prior legislation in regard to the alien residents, construed as that legislation had been by the courts, without expressing that intention in terms so clear as to leave no room for doubt. We find no such change of phraseology as to justify that conclusion."

It seems to me that when Congress enacted the immigration law of March 3, 1903, and omitted the word "immigrant," which was contained in the immigration act of 1891, as qualifying the word "alien," that Congress did in clear, plain, and unmistakable language evince an intention to materially broaden the scope of the statute. Such a material and significant change in the law so as to include all aliens, whether immigrants or otherwise, should not in my judgment be disregarded by a refinement of judicial construction. The immigration act of 1903 was certainly intended by Congress to exclude certain classes of aliens who were not excluded by the act of 1891, as the last-named act had been construed by the courts. To hold that the act of 1903 was intended merely to reach aliens belonging to the prohibited classes who should come here for a temporary residence of a few months, and not to exclude aliens belonging to the prohibited classes who had acquired a domicile in the United States, would in effect give the statute an interpretation not justified by the broad and general language employed. The immigration act of 1891 recognized the right of aliens who were not immigrants to come to the United States for temporary purposes, just as much as it recognized the right of aliens who had acquired a domicile in the United States to return here after a temporary visit abroad; and the construction of the act of 1903, which makes it operative against the alien who is not an immigrant and is coming to the United States for merely temporary purposes, and nonoperative against the alien who has acquired a domicile in the United States and is attempting to return here after having voluntarily left the country, is, in my judgment, founded upon considerations of hardship pure and simple, only differing in degree.

In the case of In re Kleibs (C. C.) 128 Fed. 656, Circuit Judge Lacombe, in dismissing the writ of habeas corpus, held that the circumstances that the petitioner had arrived in the United States by water on a prior occasion in August, 1900, and had remained in the United States four months, during which time he had bought a farm

and taken out his first papers, and since his second arrival had married here, while making his case a particularly hard one, did not relieve him from the operation of the immigration act of March 3, 1903. The decision in the Kleibs Case was rendered on the 7th day of March, 1904. In the case of Taylor v. United States, 152 Fed. 1, 81 C. C. A. 197, the Circuit Court of Appeals held that the immigration act of March 3, 1903, should receive a broad construction, at least so far as the meaning of the word "aliens" was concerned; and, while the decision in the Taylor Case was subsequently reversed by the Supreme Court of the United States (Taylor v. U. S., 207 U. S. 120, 28 Sup. Ct. 53, 52 L. Ed. 130) upon the ground that section 18 of that act did not apply to the ordinary case of a sailor while on shore leave, the Supreme Court did not take exception to the holding of the court below that the act of 1903 was intended to include certain classes of aliens who were not within the prohibitions of the immigration act of 1891.

In this same connection the language of Mr. Justice Holmes, in delivering the opinion of the Supreme Court in the Taylor Case, seems to me especially significant. He said:

"The reason for the construction adopted below was found in the omission of the word 'immigrant,' which had followed the word 'alien' in the earlier acts. No doubt that might have been intended to widen the reach of the statute; but we see no reason to suppose that the omission meant to do more than to avoid the suggestion that no one was within the act who did not come here with intent to remain."

This precise question as to the status of an alien who had acquired a domicile in the United States prior to his attempted re-entry has been discussed by the Supreme Court of the United States under the Chinese exclusion act (Act Oct. 1, 1888, c. 1064, 25 Stat. 504 [U. S. Comp. St. 1901, p. 1318]), in the case of Lem Moon Sing v. U. S., 158 U. S. 538, 15 Sup. Ct. 967, 39 L. Ed. 1082. The court in that case, among other things, said:

"The power of Congress to exclude aliens altogether from the United States, or to prescribe the terms and conditions upon which they may come to this country, and to have its declared policy, without judicial intervention, is settled by our previous adjudications. Is a statute passed in execution of that power any less applicable to an alien who has acquired a commercial domicile within the United States, but who, having voluntarily left the country, although for a temporary purpose, claims the right under some law or treaty to re-enter it? We think not. The words of the statute are broad, and include 'every case' of an alien, at least every Chinese alien, who at the time of its passage is out of this country, no matter for what reason, and seeks to come back. He is none the less an alien because of his having a commercial domicile in this country. While he lawfully remains here he is entitled to the benefit of the guarantees of life, liberty, and property, secured by the Constitution to all persons, of whatever race, within the jurisdiction of the United States. His personal rights when he is in this country, and such of his property as is here during his absence, are as fully protected by the supreme law of the land as if he were a native or naturalized citizen of the United States. But when he has voluntarily gone from the country, and is beyond its jurisdiction, being an alien, he cannot re-enter the United States in violation of the will of the government as expressed in enactments of the lawmaking power."

The words of the immigration act here under consideration are broad, and include every case of an alien who at the time of its passage

was out of this country, no matter for what reason, and seeks to come back. In the language of Mr. Justice Harlan, "He is none the less an alien because of his having a commercial domicile in this country." In the case at bar, as in the Lem Moon Sing Case, supra, the alien was out of this country at the time of the passage of the law. Whatever rights the petitioner may have had to remain in this country by reason of an alleged domicile herein prior to her leaving it in December, 1906, are not, in my opinion, material to the question in controversy; the fact remains that she voluntarily left the United States in December, 1906; and if at that time she belonged to one of the prohibited classes enumerated in the immigrant statutes then in force, or subsequently became a member of one of these classes, she has no one to blame but herself when the plain commands of the statutes are sought to be enforced against her.

Then again, in the case U. S. ex rel. Funaro v. Watchhorn (decided on the 14th day of August, 1908, by the Circuit Court for the Southern District of New York) 164 Fed. 152, Circuit Judge Ward, in construing the provisions of the immigration act of February 20, 1907, took occasion to point out that while the Circuit Court of Appeals of the Third Circuit, in the case of Rodgers v. U. S., 152 Fed. 346, 81 C. C. A. 568, and of the Sixth Circuit in the case of U. S. v. Nakashima, 160 Fed. 842, 87 C. C. A. 646, have made it clear that their construction of the act of 1903 accords with that of the petitioner, viz., that an alien who has been admitted to the United States and established a domicile here is not subject to exclusion upon his return to this country, nevertheless, as Judge Ward pointed out in the first case, the alien was discharged on the ground that he had not been afforded an appeal, while in the second case it was held that the appeal had been improperly dismissed. In other words, the Rodgers and Nakashima Cases were each decided in favor of the alien, upon the ground that the alien had been denied the right of appeal to the Secretary of Commerce and Labor secured to him by the law, and that such right can be protected by a writ of habeas corpus. In the Funaro Case, supra, it appears that the petitioner came originally to this country in 1901 and lived for six years in Pittsburg, in the state of Pennsylvania, where he had established his domicile; that in December, 1907, he went to Italy for a visit, and upon his return to this country in May, 1908, he was detained by the immigrant inspector as a person "not clearly beyond a doubt entitled to land." Judge Ward held that the writ should be dismissed and the petitioner remanded.

For these reasons, I am strongly inclined to the opinion that the petitioner in the case at bar, even if she had acquired a domicile in the United States prior to her voluntarily leaving the country in December, 1906, must be held to be within the prohibition of the immigrant law of February 20, 1907, it being conceded that she was a prostitute at the time of her re-entry, and was found practicing prostitution within three years after such re-entry.

3. But conceding for the purposes of this decision, and in order that the petitioner may have the benefit of that construction of the law most favorable to her contention, that the Rodgers and Nakashima Cases, supra, announce the correct interpretation of the immigrant statutes,

in holding that a domicile once acquired will protect an alien from exclusion or deportation when he returns to the United States after a brief visit abroad, I come at once to the question as to whether the evidence shows beyond dispute that the petitioner had acquired such a domicile; for unless the evidence taken before the immigrant inspector, and upon which the Assistant Secretary of Commerce and Labor acted when issuing his warrant for deportation, was of such a character, the finding of the Assistant Secretary of Commerce and Labor must be regarded as final, and this court would have no authority to review such finding on a writ of habeas corpus.

It appears that the petitioner came to this country when she was about 16 years of age, and worked for a short time as a domestic servant; but the evidence does not show at whose house, or at what place. It further appears that a short time before she was 18 years of age she entered a house of prostitution in the city of St. Paul, where she remained as an inmate for 2½ years, at the end of which time she became an inmate of an adjoining house of prostitution, where she remained for some 6 or 7 months, and then returned to the house of prostitution of which she had originally been an inmate, where she remained for 1 week immediately prior to her return to Sweden. She was 21 years of age, according to her own testimony, on the 1st day of December, 1906, and she sailed from New York on the 5th day of that month, or four days after she had become 21 years of age. She testified that she went back to Sweden for the purpose of visiting her home, where she remained for a period of nine months. It is true that she testified that when she left the United States she intended to come back to this country, but it does not appear that she intended to come back to the city of St. Paul, or to any other particular place. She says that when she got ready to come back she wrote to Miss Dottie Thorne, the keeper of the house of prostitution in St. Paul, of which she had been an inmate for a number of years, for a ticket and for passage money, and that Miss Thorne sent her what amounted to $113. Subsequently she did return to America, arriving in New York on the 12th day of September, 1907, and went directly to St. Paul to the house of Miss Thorne, where she had been an inmate continuously from that time until the time of her arrest. These are in substance the facts upon which the petitioner claims an established domicile in this country, such as would protect her from deportation as an alien under the immigration act of February 20, 1907.

Viewing this evidence in its most favorable light to the petitioner, can it be said that she has established the fact of her domicile in this country by such indisputable testimony as would preclude the Assistant Secretary of Commerce and Labor from finding as a fact that she had not acquired a domicile in the United States within the meaning of the decisions hereinbefore cited, holding that aliens who have acquired a domicile are not prevented from returning to the land of their birth, and subsequently re-entering the United States, unaffected by the immigration laws? If upon a consideration of the testimony submitted there was any substantial evidence upon which the Assistant Secretary of Commerce and Labor could fairly and reasonably have

reached the conclusion that the petitioner had not acquired such a domicile, and that the petitioner had not brought herself within the class of excepted aliens, then such a finding of fact cannot be disturbed or reviewed in a habeas corpus proceeding.

The domicile of a person, in a strict legal sense, is where he has his true, fixed, permanent home and principal establishment, and to which whenever he is absent he has the intention of returning. Story on Conflicting Laws (8th Ed.) § 41. It has been said that no one word in the English language is more nearly synonymous with the word "domicile" than our word "home." White v. Brown, 1 Wall. Jr. (C. C.) 262, Fed. Cas. No. 17,538; In re Craignish, 3 C. H. 180; Wood v. Roeder, 45 Neb. 311, 63 N. W. 853. With this definition of the word "domicile" in mind, can this court say that this petitioner, who had been an inmate of a house of ill fame for a period of more than three years before she returned to her home in Sweden in December, 1906, had acquired a "domicile" or a "home" in the United States? When she left for Sweden she left a house of prostitution, with nothing, so far as the record discloses, to indicate that she ever intended to return to the city of St. Paul, or to the state of Minnesota, other than her bare statement, after having been arrested for deportation, that when she went away she intended to come back. She remained away for nine months, and then returned only when she had received from the keeper of the house of prostitution sufficient money to pay her passage and expenses en route. It seems to me that, in a situation such as the petitioner was in at the time of her departure for Sweden, the law should not presume that she intended to continue in such an unlawful and degrading occupation, or to return to a house of prostitution for the purpose of making that her future "home." U. S. ex rel. Georgie White v. Hook, Warden (U. S. District Court for Maryland, decided November 19, 1908) 166 Fed. 1007. But, however this may be, there are other considerations peculiar to this case, which, in my judgment, prevent a recognition of the claim here advanced by the petitioner.

When the petitioner first came to the United States in 1901, she was only 16 years of age, and, if her testimony is to be taken as true, she was under 18 when she first became an inmate of this house of prostitution conducted by Miss Thorne. The authorities are unanimous in holding that during minority the domicile of an infant continues to be the same as that of the person from whom he took his domicile of origin, and changes only with the domicile of that person. Sharp v. Crispin, L. R. I. P. & D. 611; Marks v. Marks (C. C.) 75 Fed. 321; Johnson v. 21 Bales, etc., 2 Paine (U. S.) 601, Fed. Cas. No. 7,417; Dresser v. Edison Illuminating Co. (C. C.) 49 Fed. 257; Van Matre v. Sankey, 148 Ill. 536, 36 N. E. 628, 23 L. R. A. 665, 39 Am. St. Rep. 196; In the Matter of Benton, 92 Iowa, 202, 60 N. W. 614, 54 Am. St. Rep. 546. On the authority of these cases, the petitioner herein was absolutely incapable of acquiring a domicile in the United States during her minority. The question, therefore, arises as to when such disability was removed; whether at the age of 18, after she had entered the house of Dottie Thorne, or whether at the age of 21, which occurred four days before she took passage

166 F.—35

on the steamer at New York, for the purpose of returning, as she says, to her home in Sweden. The statute of Minnesota, Rev. Laws, § 3636, provides that "the word 'minor' means a male under the age of twenty-one years, or a female under the age of eighteen years." But are the statutes of Minnesota controlling in a case of this kind? If so, we are presented with the curious anomaly of a law of the United States relative to the exclusion of aliens operating differently in different states. Section 721 of the Revised Statutes of the United States (U. S. Comp. St. 1901, p. 581) is as follows:

"The laws of the several states, except where the Constitution, treaties or statutes of the United States otherwise require or provide, shall be regarded as the rule of decisions in trials at common law, in the courts of the United States, in cases where they apply."

It has been held by the Supreme Court of the United States that there is nothing in this section which required it to be applied to proceedings in equity or in admiralty, and that it is not applicable in criminal cases cognizable before the United States courts, or where the Constitution, treaties, or statutes of the United States require other rules of decision. Bucher v. Cheshire R. Co., 125 U. S. 583, 8 Sup. Ct. 974, 31 L. Ed. 795; Clark v. Allen (D. C.) 114 Fed. 374; Logan v. U. S., 144 U. S. 300, 12 Sup. Ct. 617, 36 L. Ed. 429. How, then, would it be possible to hold that it applies to a hearing before an administrative officer of the United States in an immigration case over which the courts have no power of revision or review? My conclusion is that the law of Minnesota which prescribes 18 as the age when a minor female becomes of age has no application to a case of this kind. We are therefore compelled to turn to the common law for the rule which must govern and control in this case.

By the common law the age of majority is fixed at 21 for both sexes, and, in the absence of any statute to the contrary, every person under that age, whether male or female, is an infant; and the same limit seems to prevail under the civil law. Rowland v. McGuire, 64 Ark. 412, 42 S. W. 1068; Dent v. Cock, 65 Ga. 400. Applying the common-law rule to this case, the petitioner did not reach her majority until the 1st day of December, 1906; prior to that time she was an infant incapable of choosing a domicile for herself, and up to that time her domicile had been that of her parents, at Carlsburg, Sweden. Furthermore, the record does not disclose whether or not she was in the state of Minnesota at the time when she reached her majority on the 1st day of December, 1906, though it does appear that she was in the city of New York on the 5th day of December of that year. It is not unreasonable to suppose that she left St. Paul not later than the 2d day of December, in order to have reached New York in time for the sailing of the steamer on the 5th day of December. Under this state of facts, and under this view of the law respecting the selection of a domicile by an infant, can it be said that the evidence adduced before the immigration inspector in Minneapolis, upon which the Assistant Secretary of Commerce and Labor based his findings, is so wholly uncontradictory and so satisfactory as to show beyond any room for dispute or doubt that the case was beyond the immigration statutes and not covered or provided for by them? In my opinion,

the petitioner has totally failed to make out a case which indisputably brings her within that class of aliens which the decisions in the Rodgers and Nakashima Cases, supra, hold to be beyond and outside of the immigration law of 1903. The burden was upon the petitioner to show, when she had the opportunity before the immigration officers, that she had acquired a domicile in the United States which would necessarily arrest all further proceedings instituted with a view to her deportation. She admitted that she was an alien and that she was a prostitute, and that she had been practicing prostitution in the city of St. Paul ever since she came to the United States in September, 1907, up to the time of her arrest. She was therefore clearly within the letter of the statutes which required her deportation, and if she was not within the spirit of the statute, as construed by the courts in the Rodgers and Nakashima Cases, it was her duty to establish such fact by clear and positive proof at the hearing before the immigrant inspector. When the petitioner, represented by counsel, appeared before the court, she failed to offer any further testimony relating to the question of her domicile, and it is questionable whether if such additional evidence had been offered and received it would have materially changed the situation.

Looking at the whole record, and making due allowance for the summary character of the proceedings before the immigrant inspector when the petitioner was examined, the court is unable to say that the petitioner's right to remain in the United States, for the reason that she had acquired a domicile therein prior to her return to Sweden, has been established beyond any room for dispute or doubt, so as to warrant this court in holding that the Assistant Secretary of Commerce and Labor was mistaken with reference to a pure question of law. I therefore hold that the evidence contained in the record was of such a character as to justify the Assistant Secretary of Commerce and Labor in finding, as in law I must assume that he found, that the petitioner did not belong to that class of aliens which by reason of their having acquired a domicile in this country should be permitted to return unaffected by our immigration laws.

The writ is discharged, and the petitioner remanded to the custody of the immigration officer, to be held for deportation; and it is so ordered.